886 P.2d 740

STATE of Hawai'i, Plaintiff–Appellee,

v.

Shawn KEKONA, Defendant–Appellant.

No. 16173.

Supreme Court of Hawai'i.

Dec. 5, 1994.

Joy Yanagida, on the briefs, Wailuku, for defendant-appellant.

James B. Takayesu, Deputy Pros. Atty., County of Maui, on the briefs, Wailuku, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

Defendant–Appellant Shawn Gregory Kealii Kekona was charged with Assault in the Second Degree in violation of Hawai'i Revised Statutes (HRS) § 707–711(1)(b) (Supp. 1991) and Robbery in the First Degree in violation of HRS § 708–840(1)(a) (1985). Kekona pleaded no contest to the lesser included offense of Robbery in the Second Degree, HRS § 708–841 (1985 & Supp.1991), subject to his right to appeal the Second Circuit Court's order denying his motion to suppress his oral statement made to police upon arrest.

Kekona contends: (1) the trial court erred in finding that Kekona's statement was voluntary; (2) the trial court erred in finding that Kekona did not invoke his right to remain silent; and (3) the State failed to meet its burden of proof to establish that Kekona made a valid waiver of his rights since the State failed to tape record the interrogation.

We disagree and affirm.

## I. FACTS

### A. Background

On October 30, 1991, Fetakoi Pahulu was arrested in connection with a robbery that occurred in Lāhainā, Maui on October 29, 1991. Although Pahulu made a written statement to police that implicated himself in the robbery, Pahulu placed primary responsibility for the crime on Kekona.

Kekona was arrested the following day and taken to the Lāhainā police station where he was processed by Detective David Blair (Blair). Detective Neil Endo (Endo) was assigned as the primary investigator in the case. After processing, Detective Endo took Kekona to an interrogation room and gave Kekona his *Miranda* warnings using a copy of the Maui Police Department Warnings and Waiver Form 103 (Form 103).

Once Kekona initialed the warnings and waiver portion of Form 103, the interrogation commenced and Kekona proceeded to give a statement regarding the robbery. At this point, the stories of Kekona and Detectives Blair and Endo conflict.

According to Kekona, after he told the detectives his version of the events leading up to the robbery, they became angry and accused him of lying. Kekona then told the detectives "I no like talk," and both detectives left the room. Upon arriving back in the room, Detective Endo told Kekona: (1) that he knew various members of Kekona's family well; (2) that the robbery victim was in critical condition; (3) that he should tell the truth; and (4) that if he did not talk, he would end up like his brother.[1] Kekona testified that he did not reinitiate the conversation and he was not given new *Miranda* warnings. Kekona then gave a different ver-

sion of the robbery, which he maintains was a "bullshit" story.[2]

In contrast, Detectives Endo and Blair testified that at no time during the interrogation session did Kekona invoke his right to remain silent or request an attorney. During the interrogation, Kekona gave them an initial version of the robbery and then asked for a break so that he could smoke a cigarette, which he was allowed to do. After five to ten minutes, Detective Endo reentered the room to continue the interrogation. Because Kekona's initial version of the robbery was plagued with inconsistencies, the detectives continued to question him. Detective Endo testified that Kekona admitted that he had "lied the first time" and then gave a second version of the robbery.

Kekona did not make a written statement and the session was not tape recorded, even though recording equipment was readily available. In addition, only Detective Endo took notes during the interrogation. Both detectives subsequently reduced Kekona's oral statement to writing in their police reports. Detective Endo drafted his report approximately ten days after the confession was taken. Detective Blair wrote his report within a week of the confession, finishing the report three weeks later.

### B. *Procedural History*

On November 13, 1991, Kekona was charged with Robbery in the First Degree, HRS § 708–840, and Assault in the Second Degree, HRS § 707–711. On December 31, 1991, Kekona filed a motion to suppress his confession on the grounds that: (1) because there was no tape recording of the session, no record existed to indicate a voluntary statement or waiver; (2) the interrogation

should have ceased after he invoked his right to remain silent; and (3) the confession was coerced and involuntary.

On March 17, 1992, the circuit court denied Kekona's motion to suppress his confession. The court found that: (1) Kekona was properly advised of his rights; (2) Kekona understood his rights, despite his learning disabilities; (3) at no time during the interrogation process did Kekona invoke his right to remain silent; (4) no coercion was used to elicit Kekona's statement; and (5) Kekona voluntarily and intelligently waived his rights prior to making his statement.

Based on its findings, the circuit court concluded as a matter of law that Kekona's statement "was freely and voluntarily given, after proper warnings of his rights and the voluntary and intelligent waiver of said rights[.]" In addition, the court concluded that "the tape recording or verbatim stenographic recording of a defendant's oral statement is not a prerequisite for establishing its voluntariness and admissibility in this jurisdiction[.]"

On March 17, 1992, Kekona entered his no contest plea to the charge of robbery in the second degree, HRS § 708–841 (1985), subject to his right to appeal the Second Circuit Court's order denying his motion to suppress his oral statement.[3] The circuit court's judgment was filed on May 21, 1992, sentencing Kekona to ten years in prison and ordering him to make restitution in the amount of $1,390.50. This timely appeal followed.

## II. *DISCUSSION*

### A. *Voluntariness of Statement*

■ Kekona contends that his oral statements to the police were involuntary and the

---

2. In his second version, Kekona stated that he and Pahulu were looking for someone to rob to get money to buy drugs. They selected Dumot because he was carrying a fanny pack that appeared large. Dumot was accosted and attempted to escape. Kekona threw a tire iron at Dumot which struck Dumot on the back of the head causing him to lose consciousness and fall to the ground. According to Kekona, Pahulu then proceeded to bash Dumot's face into the ground several times while Kekona kicked Dumot's body. (Pahulu claimed that Kekona bashed Dumot's face into the ground). Pahulu and Kekona then took the fanny pack, retrieved the money and threw the fanny pack on the roof of a public restroom. Prior to leaving the scene, Pahulu allegedly threatened an eye-witness. The eye-witness happened to be a former school teacher of both Pahulu and Kekona. The teacher, however, could only positively identify Pahulu as one of the perpetrators.

3. The second degree assault charge was dismissed pursuant to a plea and sentencing agreement.

product of coercion. In reviewing whether a statement was in fact coerced, we apply "the clearly erroneous standard to the findings on which the decision to admit the statement are based." *State v. Villeza*, 72 Haw. 327, 330, 817 P.2d 1054, 1056 (1991), *reconsideration denied*, 72 Haw. 617, 841 P.2d 1074 (1991) (citations omitted). Moreover, the court is required to examine the entire record and make an independent determination of the ultimate issue of voluntariness based on the totality of circumstances. *State v. Kelekolio*, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993).

■ In *State v. Kreps*, 4 Haw.App. 72, 661 P.2d 711 (1983), the Intermediate Court of Appeals of Hawaii stated that evidence that a defendant has read and signed a police rights and waiver form can be sufficient to establish a valid waiver, provided that the court considers "whether the words used, considering the age, background, and intelligence of the individual being interrogated, impart a clear understandable warning of all of his rights." 4 Haw.App. at 76–77, 661 P.2d at 715.

■ Although the record indicates that Kekona suffers from a learning disability, the fact that he reads at the fourth grade level does not necessarily mean he lacks the ability to knowingly waive his *Miranda* rights. *See Derrick v. Peterson*, 924 F.2d 813, 824 (9th Cir.1990) (sixteen year old with mental age of nine year old and I.Q. of 62 capable of understanding and waiving *Miranda* rights), *cert. denied*, 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991). In addition, Detectives Blair and Endo testified at the suppression hearing that prior to the interrogation, Detective Endo read each sentence of Form 103 aloud and Kekona read along. Also, each of the constitutional rights and the waiver provisions were explained to Kekona by Detective Endo prior to Kekona signing the form. Moreover, the circuit court determined that Kekona understood all of his rights. The circuit court stated in its order denying Kekona's motion to suppress statements that:

[the] Defendant acknowledged that he had been similarly warned in past encounters with the police and on at least one prior occasion invoked his rights. The Court's finding that Defendant understood his

rights is based upon the content and credibility of [Endo and Blair's] testimony, as well as an appraisal of Defendant's own testimonial responses to direct and cross-examination questioning as to the arrest, warning and waiver process[.]

Record on Appeal at 201.

■ In addition to the necessary waiver, the court must also find that such a statement was voluntarily made. *State v. Kreps*, 4 Haw.App. at 77, 661 P.2d at 715. The conditions surrounding Kekona's interrogation do not suggest that any impermissible tactics were employed by the detectives to coerce Kekona into making a statement. Kekona was interrogated for about an hour and a half by two detectives. The interrogation took place at approximately 3:00 p.m. on a weekday. Kekona asked for and was allowed to take a break during the course of the interrogation—to smoke a cigarette—and was offered something to drink. Moreover, Kekona himself admitted that he was not physically threatened during the interrogation and that no promises were made to him by the detectives.

■ Kekona contends, however, that he was coerced into making the second statement when confronted by the Detective Endo's admonition that "[i]f you don't talk, you'll end up like your brother." However, Detective Endo denied making such a statement. As the trier of fact, it is for the trial court to assess the credibility of witnesses, including defendant, and it may accept or reject such testimony in whole or in part. *State v. Aplaca*, 74 Haw. 54, 65–66, 837 P.2d 1298, 1305–1306 (1992) (citation omitted). Thus the trial court, as trier of fact, "may draw all reasonable and legitimate inferences and deductions from the evidence adduced, and findings of the trial court will not be disturbed unless clearly erroneous." *State v. Batson*, 73 Haw. 236, 245–246, 831 P.2d 924, 930, *reconsideration denied*, 73 Haw. 625, 834 P.2d 1315 (1992) (citation omitted). Apparently, the circuit court chose to believe the testimony of Detective Endo over the contrary assertions of Kekona. There is nothing in the record to suggest this determination was clearly erroneous.

■ Kekona also maintains that at the time he was questioned, Pahulu's statement had already implicated him in the robbery. Thus, Kekona contends that the police tactics used were not employed to solve a crime, but to extract trial testimony, a factor which Kekona argues prompted the United States Supreme Court in *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), to deem a confession involuntary. However, a careful reading of *Spano* indicates that where it is shown that police officers intended to extract a confession, rather than solve a crime, "the confession obtained must be examined with the most careful scrutiny." *Id.* at 324, 79 S.Ct. at 1207.

In addition, *Spano* is factually distinguishable. The defendant in *Spano* repeatedly invoked his right to counsel. *Id.* at 318–19, 79 S.Ct. at 1204–05. Furthermore, the defendant was subjected to continuous interrogation by an assistant prosecutor and several police officers for over eight hours. The interrogation lasted until the early morning hours when the defendant finally confessed. Kekona's version of the facts, even if accepted as true, does not rise to the same level of egregiousness that confronted the Supreme Court in *Spano.*

Considering the totality of circumstances surrounding Kekona's statement and the testimony presented at the suppression hearing, the circuit court did not err in concluding that Kekona's statement was freely and voluntarily given.

### B. Whether Kekona Invoked His Right to Remain Silent

■ Kekona also contends that the trial court erred in finding that he did not invoke his right to remain silent.[4] A trial court's determination of whether a defendant invoked his right to remain silent is a question of fact. *Cf. State v. Nelson,* 69 Haw. 461, 469, 748 P.2d 365, 370 (1987) (whether defendant invoked his right to counsel is a question of fact). A trial court's findings of fact

4. "[I]f an individual indicates in any manner, at any time prior to or during interrogation that he wishes to remain silent, the interrogation must cease." *State v. Uganiza,* 68 Haw. 28, 31, 702 P.2d 1352, 1354 (1985) (citations omitted). *See*

will not be disturbed unless clearly erroneous. *State v. Batson,* 73 Haw. at 246, 831 P.2d at 930. A finding of fact is not clearly erroneous unless after reviewing the entire record, the supreme court is left with the definite and firm conviction that a mistake has been made. *Id.* (citation omitted).

■ The only evidence of whether Kekona invoked his right to remain silent is testimony elicited during the suppression hearing, when Kekona claimed that he told the detectives, "I no like talk no more." In contrast, Detectives Endo and Blair both testified that while Kekona requested a break to smoke a cigarette, at no time did Kekona invoke either his right to remain silent or his right to counsel. The trial court, after assessing "the content and credibility" of the detectives' testimony, "as well as an appraisal of Defendant's own testimonial responses to direct and cross-examination," obviously believed the Detectives.

■ The trial court, as the finder of fact, may draw reasonable and legitimate inferences and deductions from the evidence. *State v. Batson,* 73 Haw. at 245–46, 831 P.2d at 930. Moreover, it is for the trial court to assess the credibility of witnesses, including defendant, and it may accept or reject such testimony in whole or in part. *State v. Aplaca,* 74 Haw. 54, 65–66, 837 P.2d 1298, 1305–1306 (1992) (citation omitted). Thus, because the circuit court is empowered to assess the credibility of witnesses in making its findings of fact, weigh conflicting evidence, and draw reasonable inferences, the circuit court's finding that Kekona did not invoke his right to remain silent is not clearly erroneous.

### C. Tape Recording Requirement

■ Finally, Kekona argues that in order for the State to meet its burden of proving that he validly waived his constitutional rights, the police were required to tape record all of his oral statements. Because we have not previously addressed this issue,[5]

*also Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, *reh'g. denied,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981).

5. The State erroneously asserts that this issue was fully considered in *State v. Kalani,* 3 Haw.

Kekona relies for support on the Alaska Supreme Court's decision in *Stephan v. State of Alaska,* 711 P.2d 1156 (Alaska 1985).

In *Stephan,* defendants appealed the trial court's refusal to grant their motion to suppress confessions made during their interrogations by police. At the suppression hearing, there was conflicting testimony about what occurred during the unrecorded portions of the interviews. Defendants claimed, *inter alia,* that they were not informed of their *Miranda* rights and that questioning continued after they had asserted their right to remain silent and had requested an attorney. The police officers testified to the contrary.

Reversing the court below, the Alaska Supreme Court held that in order to be admissible under the due process clause of the Alaska State Constitution, all custodial confessions must be recorded when the interrogation occurs in a place of detention and recording is feasible.[6] *Id.* at 1159–60. The supreme court reasoned that a recording in such circumstances is "a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." *Id.* The supreme court also noted that a recording would "aid law enforcement efforts, by confirming the content and the voluntariness of a confession, when a defendant changes his testimony or claims falsely that his constitutional rights were violated." *Id.* at 1161. In

addition, the court held that exclusion is the appropriate remedy for an unexcused failure to electronically record an interrogation, when such recording is feasible. *Id.* at 1163.

While other jurisdictions have also recognized the importance of recording custodial interrogations,[7] a majority of jurisdictions have specifically declined to adopt the *Stephan* rule that mandates the electronic recording of a suspect's statements as a requirement of due process. *See People v. Raibon,* 843 P.2d 46, 48 (Colo.App.1992), *cert. denied,* (January 11, 1993); *State v. Rhoades,* 121 Idaho 63, 73, 822 P.2d 960, 970 (1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 962, 122 L.Ed.2d 119 (1993); *Jimenez v. State,* 105 Nev. 337, 775 P.2d 694, 696 (1989); *State v. Spurgeon,* 63 Wash.App. 503, 504, 820 P.2d 960, 961 (1991), *review denied,* 118 Wash.2d 1024, 827 P.2d 1393 (1992); *Coleman v. State,* 189 Ga.App. 366, 366, 375 S.E.2d 663, 664 (1988); *People v. Everette,* 187 Ill.App.3d 1063, 1075, 135 Ill.Dec. 472, 479, 543 N.E.2d 1040, 1047 (1989); *State v. Buzzell,* 617 A.2d 1016, 1018 (Me.1992); *Commonwealth v. Fryar,* 414 Mass. 732, 740 n. 8, 610 N.E.2d 903, 909 n. 8 (1993); *Williams v. State,* 522 So.2d 201, 208 (Miss.1988); *State v. Gorton,* 149 Vt. 602, 606, 548 A.2d 419, 421 (1988). *See generally People v. Wimberly,* 5 Cal. App.4th 773, 791 n. 13, 7 Cal.Rptr.2d 152, 162 n. 13 (1992).

Although having an electronic recording of all custodial interrogations would undoubted-

---

App. 334, 649 P.2d 1188 (1982). While the facts of *Kalani* involve the tape recording of a confession, the issue of whether an accused is constitutionally entitled to have his custodial interrogation tape recorded was not presented to the court.

**6.** The supreme court agreed that the due process clause of the United States Constitution does not require the recording of custodial interrogations under the constitutional materiality test enunciated by the United States Supreme Court in *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Consequently, the court expressly based its ruling upon its interpretation of the due process clause of the Alaska State Constitution. *Id.* at 1160. Alaska Const. art. I, § 7 provides, in part: "No person shall be deprived of life, liberty, or property without due process of law."

**7.** *See Hendricks v. Swenson,* 456 F.2d 503 (8th Cir.1972) (suggesting that videotapes of interrogations protected defendant's rights); *Smith v. State,* 548 So.2d 673 (Fla.Dist.Ct.App.1987) (quoting *Stephan v. State of Alaska, supra,* with approval); *Ragan v. State,* 642 S.W.2d 489 (Tex. Crim.App.1982) (Tex.Code Crim.Proc.Ann. art. 38.22 § 3 (Vernon 1979) requires that oral statements of the accused must be recorded in order to be admissible); *A Model Code of Pre-arraignment Procedure* § 130.4 (Official Draft 1975) (requiring sound recordings of custodial interviews); Unif.R.Crim.P. Rule 243 (1987) ("The information of rights, any waiver thereof, and any questioning shall be recorded whenever feasible and in any case where questioning occurs at a place of detention."); Ingrid Kane, Note, *No more Secrets: Proposed Minnesota State Due Process Requirement That Law Enforcement Officers Electronically Record Custodial Interrogation and Confessions,* 77 Minn.L.Rev. 983 (1993).

ly assist the trier of fact in ascertaining the truth, we do not agree that the due process clause of our State Constitution requires such a practice. Article I, section 5 of the Hawai'i Constitution provides that "[n]o person shall be deprived of life, liberty, or property without due process of law[.]" The due process clause "serves to protect the right of an accused in a criminal case to a fundamentally fair trial." *State v. Matafeo,* 71 Haw. 183, 185, 787 P.2d 671, 672 (1990) (citing *State v. Keliiholokai,* 58 Haw. 356, 569 P.2d 891 (1977)). We cannot say that the failure of the police to manufacture a tape recording of Kekona's station house interrogation was so detrimental to his defense that it necessarily resulted in a unfair trial.

■ At the suppression hearing, the defense had an opportunity to thoroughly cross-examine Detectives Endo and Blair. In addition, Kekona himself provided testimony of his version of the events that transpired during the interrogation. The circuit court, after hearing the evidence, found the testimony of the detectives to be more reliable. Indeed, the concern in this case centers on the credibility of the accused and the police officers who testified, not some unconstitutional action. *See Jimenez,* 775 P.2d at 696. "When a motion to suppress evidence is heard, [i]t is for the trial [court] as factfinder to assess credibility of witnesses, including defendants, and to resolve all questions of fact[.]" *State v. Nelson,* 69 Haw. 461, at 468, 748 P.2d 365.

While the trial judge determines the admissibility of a confession, the "defendant [still] retains the right to put before the jury, as the trier of fact, all evidence, including the facts and circumstances surrounding the making of his confession, 'relevant to weight or credibility.'" *State v. Kelekolio,* 74 Haw. 479, 516, 849 P.2d 58, 75 (1993). Therefore, whether the failure of the police to create a record of the defendant's confession undermines its accuracy and detracts from the credibility of later testimony is an issue uniquely left to the sound discretion of the trier of fact.

Undeniably, recording a custodial interrogation is important in many contexts. A recording would be helpful to both the suspect and the police by obviating the "swearing contest" which too often arises when an accused maintains that she asserted her constitutional right to remain silent or requested an attorney and the police. testify to the contrary. A recording would also "help to demonstrate the voluntariness of the confession, the context in which a particular statement was made and of course, the actual content of the statement." *Williams,* 522 So.2d at 208. Consequently, although we decline to interpret the due process clause of the Hawai'i Constitution as requiring that all custodial interrogations be recorded, we nevertheless stress the importance of utilizing tape recordings during custodial interrogations when feasible.

The dissent suggests that, as the song goes, there's going to be a "hush all over the [state] tonight" when audio and video cassette recorders are being turned off in interrogation rooms across the state in response to the majority opinion. Yet, according to the cynical nature of the dissent's argument, even if we were to hold that the due process clause mandates the recording of *station house* interrogations, there would still be a "hush all over the [state] tonight." This time, however, the silence in the station houses would come from the new police policy of conducting all interrogations out in the field where, the minority apparently concedes, the due process clause does not require that interrogations be recorded. We refuse to adopt such a pessimistic outlook towards the potential consequences of our opinion.

### III. *CONCLUSION*

We decline to hold that the State must tape record a custodial interrogation in order to establish a valid waiver of a criminal defendant's constitutional rights. We further hold that the circuit court did not err in ruling that Kekona's statement was freely and voluntarily given and that Kekona did not invoke his right to remain silent.

The circuit court's order denying Kekona's motion to suppress his statement made to police is affirmed.

LEVINSON, Justice, concurring and dissenting.

On March 17, 1992, when the circuit court entered its findings of fact, conclusions of law, and order denying the defendant Kekona's motion to suppress, the proposition "[t]hat the tape recording or verbatim stenographic recording of a defendant's oral statement [was] not a prerequisite for establishing its voluntariness and admissibility in this jurisdiction," *see* the circuit court's Conclusion of Law (COL) No. 1, was not an incorrect statement of Hawai'i law. Moreover, the circuit court's COL No. 2—"[t]hat the statement of [the] [d]efendant ... Kekona ... was freely and voluntarily given, after proper warnings of his rights and the voluntary and intelligent waiver of said rights"—is supported by its findings of fact (FOF's). It is for these reasons alone that I concur in the judgment of the court. *See Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 29, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992).

But therein lies the rub. Despite the fact that "recording equipment was readily available" at the Lāhainā police station on October 31, 1991, majority opinion at 4, Detectives Endo and Blair inexplicably failed to preserve Kekona's statement to them verbatim. Thus, our ability to determine on review whether the circuit court's FOFs that "[Kekona] ... never invoked his right to silence" (FOF No. 6), "[n]o coercion, threats ..., or improper inducements were utilized to elicit [Kekona's] statement" (FOF No. 8), and "[Kekona] at no time during the interrogation process ... invoke[d] his right to terminate questioning" (FOF No. 10) are clearly erroneous has been severely hampered. Or stated more aptly, the informational vacuum created by the lack of a verbatim rendition of Kekona's interrogation substantially diminishes the reliability of an examination of " 'the entire record and ... an independent

determination of the ultimate issue of voluntariness' based upon ... 'the totality of the circumstances surrounding [the defendant's] statement.' " *State v. Kelekolio*, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (citations omitted).

And yet, had the investigating detectives merely pressed the "record" button of the "readily available" recording equipment, the record before us would reflect—to an objective *certainty*—whether, in the course of questioning, Kekona in fact declared that "I no like talk" and whether Detective Endo thereafter represented to Kekona "that he knew various members of Kekona's family well," majority opinion at 404, 886 P.2d at 741, and that "if [Kekona] did not talk, [Kekona] would end up like his brother." *Id.* at 404, 886 P.2d at 741. As the song lyric goes, if "there's a kind of hush all over the [state] tonight," it comes, in response to the majority opinion, from the sound of audio and video cassette recorders being turned off in the interrogation rooms of police station houses.[1]

Because I believe that (1) the majority is ostensibly making ·a mistake in not learning the lesson of this appeal by applying the rule of *Stephan v. State*, 711 P.2d 1156 (Alaska 1985) *prospectively* to article I, section 5 of the Hawai'i Constitution (1978),[2] and (2) the majority opinion (a) virtually invites a deluge of time-consuming and avoidable appeals in the future and (b) significantly misapplies *Kelekolio* and *State v. Batson*, 73 Haw. 236, 831 P.2d 924, *reconsideration denied*, 73 Haw. 625, 834 P.2d 1315 (1992), I am compelled to part company with the majority opinion.

### I.  THE "STEPHAN RULE"

I would hold all custodial police interrogations of criminal suspects, conducted *after*

---

1. The majority characterizes my concern as "cynical." Majority opinion at 409, 886 P.2d at 746. Time will tell. In the meantime, I offer the wisdom of Francis Bacon: "For behaviour, men learn it, as they take diseases, one of another." F. Bacon, *The Advancement of Learning* (1605) (reprinted in D. Shrager and E. Frost, *The Quotable Lawyer* 129 (1986)).

2. Article I, section 5 of the Hawai'i Constitution (1978) provides in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law[.]"

the date of this opinion,[3] to the following standard:

> ... Electronic recording of suspect interrogations ... is a requirement of state due process *when the interrogation occurs in a place of detention and recording is feasible.* We reach this conclusion because we are convinced that recording, in such circumstances, is now a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his [or her] right against self-incrimination and, ultimately, his [or her] right to a fair trial.

> *The contents of an interrogation are obviously material to the voluntariness of a confession.* The state usually attempts to show voluntariness through the interrogating officer's testimony that the defendant's constitutional rights were protected. The defendant, on the other hand, often testifies to the contrary. The result, then, is a swearing match between the law enforcement official and the defendant, which the courts must resolve.

> The difficulty in depicting what transpires at such interrogations stems from the fact that in this country they have largely taken place incommunicado.

> ....

> ... Interrogation still takes place in privacy. Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms.

*Miranda [v. Arizona],* 384 U.S. [436,] 445, 448, 86 S.Ct. [1602,] 1612, 1614, 16 L.Ed.2d [694] [ (1966) ]. Thus, we believe a recording requirement is justified, because "a tape recording provides an objective means for evaluating what occurred during interrogation." [Citation omitted.]

Although there are undoubtedly cases where the testimony on one side or the other is intentionally false, dishonesty is not our main concern. Human memory is

---

3. Implicit in the factors [to be considered in determining whether a judicial decision will be applied retroactively] is the concept of fairness. Thus, where substantial prejudice results from the retrospective application of a new legal principle to a given set of facts, the inequity may be avoided by giving the guiding principles prospective application only.
*State v. Ikezawa,* 75 Haw. 210, 220–21, 857 P.2d 593, 598 (1993) (footnote omitted). "Substantial prejudice" resulting from the "retrospective application of a new legal principle" can derive from " 'the extent of reliance by law enforcement authorities on the old standards[.]' " *Id.* at 220, 857 P.2d at 598 (quoting *State v. Santiago,* 53 Haw. 254, 268–69, 492 P.2d 657, 665–66 (1971)).

Were we to apply *"Stephan* rule" to vacate Kekona's conviction in the present case, persuasive federal authority would suggest that we would be obligated to apply the same rule to all other criminal proceedings currently pending in the court system. *Powell v. Nevada,* — U.S. ——, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994); *Griffith v. Kentucky,* 479 U.S. 314, 322–28, 107 S.Ct. 708, 712–16, 93 L.Ed.2d 649 (1987). I do not believe, however, that the reasoning of *Powell* and *Griffith* would compel us to apply the *Stephan* rule to the present appeal, even if we were to use the present appeal as an opportunity to announce the applicability of the *Stephan* rule to interrogations conducted after the date of this opinion.

In *Powell,* the United States Supreme Court stated:

We held in *Griffith v. Kentucky,* 479 U.S. at 328 [107 S.Ct. at 716], that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Griffith* stressed two points. First, "the nature of judicial review ... precludes us from '[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule.' " *Id.* at 323 [107 S.Ct. at 713]. Second, *"selective application* of new rules violates the principle of treating *similarly situated defendants* the same." [*Id.*] Assuming, *arguendo,* that the [constitutional standard] ... qualifies as a "new rule," cf. *Teague v. Lane,* 489 U.S. 288, 299–310 [109 S.Ct. 1060, 1068–76, 103 L.Ed.2d 334] (1989), *Griffith* nonetheless entitles Powell to rely on [the new constitutional standard] for this simple reason: Powell's conviction was not final when [the new constitutional standard] was announced.
*Powell,* — U.S. at ——, 114 S.Ct. at 1283 (citation omitted and emphasis added).

In my view, application of the *Stephan* rule to police interrogations occurring after the date of this opinion would not violate the reasoning of *Powell* and *Griffith* because there would be no "selective application" of the rule to "similarly situated defendants." This is the case because neither Kekona nor any other present criminal defendant would derive the benefit of the *Stephan* rule. Thus, the "new rule" would apply only to future and as yet uncharged criminal defendants.

often faulty—people forget specific facts, or reconstruct and interpret past events differently.

> It is not because a police officer is more dishonest than the rest of us that we ... demand an objective recordation of the critical events. Rather, it is because we are entitled to assume that he is no less human—no less inclined to reconstruct and interpret past events in a light most favorable to himself—that we should not permit him to be a "judge of his own cause."

Kamisar[, *Forward: Brewer v. Williams— A Hard Look as a Discomfitting [sic] Record*, 66 Geo.L.J. 209,] 242–43 [ (1977– 78) ] (citation omitted). Defendants, undoubtedly, are equally fallible.

In the absence of an accurate record, the accused may suffer an infringement upon his [or her] right to remain silent and to have counsel present during the interrogation. Also, his [or her] right to a fair trial may be violated, if an illegally obtained, and possibly false, confession is subsequently admitted. *An electronic recording, thus, protects the defendant's constitutional rights, by providing an objective means for him [or her] to corroborate his [or her] testimony concerning the circumstances of the confession.*

The recording of custodial interrogations is not, however, a measure intended to protect only the accused; *a recording also protects the public's interest in honest and effective law enforcement, and the individual interests of those police officers wrongfully accused of improper tactics. A recording, in many cases, will aid law enforcement efforts, by confirming the content and the voluntariness of a confession, when a defendant* changes his [or her] testimony or *claims falsely that his [or her] constitutional rights were violated. In any case, a recording will help trial and appellate courts to ascertain the truth.*

. . . .

In summary, the rule that we adopt today requires that custodial interrogations in a place of detention, including the giving of the accused's *Miranda* rights, must be electronically recorded. To satisfy this due process requirement, the recording must clearly indicate that it recounts the entire interview. Thus, explanations should be given at the beginning, the end and before and after any interrogations in the recording, so that courts are not left to speculate about what took place.

*Stephan,* 711 P.2d at 1159–62 (emphasis added and citation omitted).[4]

Unless I am missing something, the majority opinion seems to acknowledge the merits of the *Stephan* analysis. *See* majority opinion at 408–09, 886 P.2d at 745–746. The majority concedes that "having an electronic recording of all custodial interrogations would undoubtedly assist the trier of fact in ascertaining the truth[.]" *Id.* at 409, 886 P.2d at 746. The majority further concedes that

> recording a custodial interrogation ... would be helpful to both the suspect and the police by obviating the "swearing contest" which too often arises when an accused maintains that [he or] she asserted [his or] her constitutional right to remain silent or requested an attorney and the police testify to the contrary. A recording would also help to demonstrate the voluntariness of the confession, the context in which a particular statement was made and of course, the actual contènt of the statement.

*Id.* at 409, 886 P.2d at 746 (citation and quotation marks omitted). Thus, for precisely the reasons enumerated in *Stephan,* the majority "stress[es] the importance of utilizing tape recordings during custodial interrogations when feasible." *Id.*

What action, I wonder, will this court take in the future if the police fail to "utiliz[e] tape recordings during custodial interrogations when feasible"? Will it be content merely to

---

4. I should note that in three years of presiding over criminal felony trials as a circuit court judge, from April 1989 through March 1992, it was my experience that the practices of the Honolulu Police Department consistently complied with the procedures prescribed in *Stephan.* It is thus self-evident, at least to me, that the *"Stephan* rule" poses no practical difficulty to the police.

express righteous indignation or moral distaste? And what *consequence,* I wonder will this court impose as a result of such a failure by the police? Will it refuse to mention the failed interrogators in its prayers? Will it wring ·its hands over the blind frailties of humankind? Will it engage in toothless expressions of disapproval in opinions yet to be written? Or is it possible that this court will reveal that, after all, the failure electronically to record all station house interrogations from beginning to end, where it is feasible to do so, does indeed contravene a criminal defendant's rights under article I, section 5 of the Hawai'i Constitution? And is it possible that this court will elect to foreclose the admissibility of such unrecorded interrogations? I suspect that it is.

Nevertheless, the majority opinion purports to be unwilling to adopt the *"Stephan* rule" by "declin[ing] to interpret the due process clause of the Hawai'i Constitution as requiring that all custodial interrogations be recorded." *Id.* All of this is a puzzlement to me.

The majority notes that "the [Alaska Supreme C]ourt expressly based its ruling upon its interpretation of the due process clause of the Alaska State Constitution," majority opinion at 408 n. 6, 886 P.2d at 745 n. 6, having "agreed that the due process clause of the United States Constitution does not require the recording of custodial interrogations under the constitutional materiality test enunciated ... in *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)." *Id.* There is nothing outlandish about the Alaska Supreme Court's reliance upon its state's constitution in order to expand the parameters of due process beyond those perceived in the United States Constitution. Professor Friesen, who authored what may be the first exhaustive treatise on the subject, has noted as an introductory matter that:

> Since 1970, state supreme courts have handed down hundreds of opinions that grant protection for civil rights and liberties, based on provisions in their state constitutions, that is greater than or equivalent to the protection given these rights under parallel provisions of the United

States Constitution as interpreted by the [United States] Supreme Court. Independently reasoned opinions sometimes express a desire to grant "more" than an unwelcome Supreme Court decision, but independent state courts are not merely reactive. Some use an independent approach as a matter of course, without regard to what happens to be the current trend in the Supreme Court. Some state decisions have upheld or denied a right asserted under state law that federal law has not clearly addressed, and some have even found that the state provision did not protect a right that federal law would grant. In addition to these holdings that uncouple state Bills of Rights from their federal counterparts, state courts enforcing state charters have been steadily developing protections for rights that are uniquely or primarily guaranteed by state rather than federal law.

> . . . .

> The state constitutional revival sometimes goes under the name of "new federalism" or "judicial federalism" to signify the growing importance of "states' rights" for individuals. Like other state laws, these rights co-exist with, and often exceed, national constitutional rights. Renewed interest in state law is in part a response to the perception that national rights are no longer interpreted as generously as in previous decades. It is a mischaracterization, however, to view state constitutional law merely as serving particular ideological ends. Many independent state rights decisions do serve "liberal" goals, if liberal is defined as "more expansive than the current Supreme Court." But others would be equally welcomed by political "conservatives."

J. Friesen, *State Constitutional Law* ¶ 1.01 (1993) (footnotes omitted).

The majority's unwillingness to adopt the *Stephan* rule expressly, when it seems to have done so impliedly, is particularly bizarre because this court has historically been in the forefront of extending the rights and liberties of persons subject to local law on independent state constitutional grounds, and we

should be proud of that fact.[5] *See, e.g., State v. Texeira,* 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967) (enunciating general principle); *State v. Grahovac,* 52 Haw. 527, 531, 533, 480 P.2d 148, 151–52 (1971) (portions of vagrancy statute violate state constitutional right against self-incrimination); *State v. Santiago,* 53 Haw. 254, 265–66, 492 P.2d 657, 664 (1971) (use of illegally obtained confession inadmissible under state constitution for impeachment purposes); *State v. Kaluna,* 55 Haw. 361, 367–69, 372–75, 520 P.2d 51, 57–58, 60–62 (1974) (limiting, on state constitutional grounds, scope of (1) warrantless searches incident to valid custodial arrest and (2) pre-incarceration "inventory" searches); *State v. Miyasaki,* 62 Haw. 269, 280–82, 614 P.2d 915, 921–23 (1980) (use, as opposed to transactional, immunity violates state constitutional right against self-incrimination); *Huihui v. Shimoda,* 64 Haw. 527, 531, 644 P.2d 968, 971 (1982) (restricting, on state constitutional grounds, basis for denial of criminal defendant's access to bail); *State v. Fields,* 67 Haw. 268, 282, 686 P.2d 1379, 1390 (1984) (circumscribing, on state constitutional grounds, warrantless searches of probationers); *State v. Tanaka,* 67 Haw. 658, 661–62, 701 P.2d 1274, 1276 (1985) (reasonable expectation of privacy in trash bags precludes, on state constitutional grounds, warrantless seizure of them in absence of exigent circumstances); *State v. Kim,* 68 Haw. 286, 289–90, 711 P.2d 1291, 1293–94 (1985) (state constitutional privacy rights limit prerogative of police to order persons out of cars after traffic stops); *State v. Kam,* 69 Haw. 483, 491, 748 P.2d 372, 377 (1988) (statute prohibiting promotion of pornographic adult magazines violated purchasers' right under state constitution to use those items in privacy of their homes); *State v. Quino,* 74 Haw. 161, 171–73, 175–76, 840 P.2d 358, 363–65 (1992) (defendant "seized" under state constitution when approached by police officers in airport and officers' questions turned from general to inquisitive; police officers cannot randomly encounter individuals without any objective basis for suspecting them of misconduct and then place them in coercive environment in order to develop reasonable suspicion to justify detention); *Baehr v. Lewin,* 74 Haw. 530, 562–64, 580, 852 P.2d 44, 59–60, 67, *reconsideration granted in part,* 74 Haw. 650, 875 P.2d 225 (1993) (state constitution prohibits state-sanctioned discrimination against any person in exercise of civil rights on basis of sex; sex being suspect category for purposes of state constitution, statute restricting marital relation to male and female is (1) subject to "strict scrutiny" test on state equal protection challenge and (2) presumptively unconstitutional unless both justified by compelling state interests and narrowly drawn to avoid unnecessary abridgments of constitutional rights); *State v. Lessary,* 75 Haw. 446, 457–59, 865 P.2d 150, 155–56 (1994) (double jeopardy clause of state constitution requires application of "same conduct" test); *State v. Kearns,* 75 Haw. 558, 567, 571, 867 P.2d 903, 907, 909 (1994) (under state constitution, (1) person "seized" when police officer approaches for express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information, and (2) investigative encounter only "consensual" if (a) prior to start of questioning, person is informed of right to decline participation and to leave at any time, and (b) person thereafter voluntarily participates in encounter); *State v. Hoey,* 77 Hawai'i 17, 35–36, 881 P.2d 504, 522–23 (1994) (rejecting *Davis v. United States,* —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), court held that, under state constitution, (1) when suspect makes ambiguous or equivocal request for counsel during custodial interrogation, police must either cease all questioning or seek non-substantive clarification of suspect's request, and (2) if, upon clarification, defendant unambiguously and unequivocally invokes right to counsel, all substantive questioning must cease until counsel present); *State v. Bowe,* 77 Hawai'i 51, 57, 881 P.2d 538, 544 (1994) (rejecting *Colorado v. Connel-*

---

**5.** That "a majority of jurisdictions have specifically declined to adopt the *Stephan* rule ... as a requirement of due process," majority opinion at 408, 886 P.2d at 745, is hardly a daunting obstacle. We have not shrunk in the past from separating ourselves from the pack when it has been the right thing to do. And when we have pioneered a new constitutional principle, we have by definition stood alone. *See, e.g., Baehr v. Lewin,* 74 Haw. 530, 645, 852 P.2d 44, *reconsideration granted in part,* 74 Haw. 650, 875 P.2d 225 (1993).

*ly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), court held that, under state constitution, coercive conduct of private person may be sufficient to render defendant's confession involuntary).

I can think of no possible justification as to why, given the dangers and potential abuses so thoroughly explored in *Stephan,* the police should be permitted to engage in unrecorded custodial interrogations when recording is otherwise *feasible.* I submit that the majority has been unable to think of any justification either. If I am correct, then there is everything to gain and nothing to lose by adopting the *Stephan* rule *prospectively.* That is precisely what makes the majority opinion so baffling to me, especially in the face of the majority's acknowledgment of "the importance of utilizing tape recordings during custodial interrogations when feasible." Majority opinion at 409, 886 P.2d at 746.

## II. *The Majority Opinion Compounds And Aggravates The Uganiza/Edwards/Mailo/Hoey Problem.*

At this juncture, a central element of the *Stephan* analysis needs to be repeated: "In the absence of an accurate record [of custodial police interrogations], the accused may suffer an infringement upon his right to remain silent and to have counsel present during the interrogation." *Stephan,* 711 P.2d at 1161. I fear that the failure of the majority opinion adequately to address this concern may seriously undermine existing Hawai'i case law.

The majority opinion acknowledges that "Kekona . . . contends that the trial court erred in finding that he did not invoke his right to remain silent," majority opinion at 407, 886 P.2d at 744, in light of Kekona's claim that he sought to terminate his interrogation by announcing to no avail that "I no like talk." *Id.* at 404, 886 P.2d at 741.

It is the law of this state that:

Basic to the privilege against self-incrimination is the right of an individual accused or suspected of a crime not to speak. This is because without the right to cut off police questioning, the inherently compelling pressures of in-custody interrogation operate to overbear free choice, the foundation of the privilege, and statements elicited after its invocation cannot be other than the product of compulsion. *Miranda v. Arizona,* [384 U.S.] at 474, 86 S.Ct. at 1627. Accordingly, if an individual indicates in any manner, at any time prior to or during interrogation that he [or she] wishes to remain silent, the interrogation must cease. *Id.* at 473, 474, 86 S.Ct. at 1627. . . . At this point he [or she] has shown that he [or she] intends to exercise the privilege. *Id.*

*State v. Uganiza,* 68 Haw. 28, 30–31, 702 P.2d 1352, 1354 (1985) (additional citations omitted). Statements obtained in violation of the *Uganiza* rule are inadmissible for any purpose as a *per se* matter. *State v. Valera,* 74 Haw. 424, 433–34, 848 P.2d 376, 380 (1993) (citing *Miranda* and *Uganiza*).

Citing *Batson,* 73 Haw. at 245–46, 831 P.2d at 930, the majority opinion seeks to deflect the *Uganiza* problem by (1) invoking the principle that "[a] trial court's findings of fact will not be disturbed unless clearly erroneous," (2) stating that "[a] finding of fact is not clearly erroneous unless after reviewing the entire record, the supreme court is left with the definite and firm conviction that a mistake has been made," and (3) concluding that "the circuit court's finding that Kekona did not invoke his right to remain silent is not clearly erroneous." Majority opinion at 407, 886 P.2d at 744.

The majority opinion both misapplies *Batson* and perverts a critical principle of *Kelekolio.* The *Batson* proposition is that a trial court's finding of fact is subject to the "clearly erroneous" standard of review. The voluntariness of Kekona's confession, however, is *not* an issue for the trier of fact to be resolved during the adjudicative phase of trial. Rather, it is a threshold issue of *admissibility* "for the . . . judge to determine" out of the hearing of the jury. *Kelekolio,* 74 Haw. at 515–16, 849 P.2d at 75; *see also* Hawai'i Rules of Evidence 104(e). Accordingly, contrary to the majority opinion's analysis, the circuit court's finding that Kekona did not invoke his right to remain silent—which is relevant to the question of *volun-*

*tariness*—is not merely subject to a "clearly erroneous" analysis on review, but rather is to be reviewed *de novo* based upon an " 'examin[ation] of the entire record and ... an independent determination ...' [of] 'the totality of circumstances surrounding [the defendant's] statement.' " *Kelekolio,* 74 Haw. at 502, 849 P.2d at 69 (citing, *inter alia, State v. Villeza,* 72 Haw. 327, 330–31, 817 P.2d 1054, 1056 (1991)). *See also Hoey,* 77 Hawai'i at 32, 881 P.2d at 519 ("[W]e apply a *de novo* standard of appellate review to the ultimate issue [of the] voluntariness of a confession."). The majority opinion, at 406, 886 P.2d at 743, admits as much.

The majority opinion's application of the wrong standard of review both begs the question under review and highlights the wisdom of the *Stephan* rule. It is precisely because "[t]he only evidence of whether Kekona invoked his right to remain silent is *testimony* elicited during the suppression hearing," majority opinion at 407, 886 P.2d at 744 (emphasis added), and there is no recordation of Kekona's interrogation by the police that our ability to review the circuit court's finding of voluntariness is unnecessarily impaired. If the *Stephan* rule were in effect and had been followed in this case, we would know to a certainty what was said in the course of Kekona's interrogation and would not be forced to deal with conflicting testimony at a suppression hearing that seeks to reconstruct, subject to the vagaries of memory and the self-interest of the parties, who said what and to whom. I understand that fact finding, in the context of trial testimony, typically involves questions of credibility and the weight and effect of evidence. But in the context of a suppression hearing, the efficacy of *de novo* review would be materially enhanced by a verbatim record of the interrogation.

In the same vein, and although the right to have counsel present during custodial interrogation is not directly in issue in this case, I am concerned that the unwillingness of the majority to adopt the *Stephan* rule prospectively will come back to haunt us on that subject as well. Specifically, in the absence of the *Stephan* rule, enforcement of this court's holdings in *State v. Mailo,* 69 Haw. 51, 731 P.2d 1264 (1987), and *Hoey, supra,* may be virtually impossible.

In *Mailo,* the defendant appealed the circuit court's order denying his motion to suppress statements made by him during a custodial interrogation, arguing that his rights to counsel and to remain silent under the fifth and sixth amendments to the United States Constitution and article I, sections 10 and 14 of the Hawai'i Constitution had been violated. The statement was subsequently used at trial to impeach the defendant's testimony. Fortunately, the defendant's interrogation had been taped [6] and was a part of the record on appeal. The relevant portions of the transcribed questions posed by the interrogating police officer and the defendant's responses were as follows:

Q  Okay.... I am gonna ask you questions about a Sodomy, Kidnapping which occurred on 6–27–85 at 1164 Maunakea Street. Okay, understand?

A  Yeah.

Q  You don't have to talk now if you don't want to. You don't have to say anything to me or answer any of my questions. Anything you say may be used against you at your trial. You have the right to counsel of your choice or to talk to anyone else you may want to. You also have the right to have an attorney present while I talk to you. You know what an attorney is? Attorney is lawyer. You know what a lawyer is?

A  Oh, yeah.

Q  Okay? Same thing. If you cannot afford an attorney, the court will appoint one for you. *Do you want an attorney now?*

A  *(Inaudible).*

Q  *You want a lawyer here while I talk to you?*

A  *Yeah.*

Q  You want a lawyer now? ... while I talk to you or don't you want a lawyer?

A  Nah, 'as all right.

Q  You don't want one?

---

6.  *See supra* note 4.

A  Uh.

Q  Okay. . . .

*Id.* at 52, 731 P.2d at 1265–66 (emphasis in original).  The interrogating police officer testified on direct examination at the suppression hearing that he had no independent recollection of the defendant's responses to the questions set forth above.  *Id.* at 52, 731 P.2d at 1266.  However, apparently after having heard the tape recording, he acknowledged on cross-examination that "he clearly understood 'Yeah' as an affirmative response."  *Id.*

The *Mailo* court ruled as follows:

> We stress again that once an accused has expressed his desire to deal with police interrogators only through counsel, he cannot be further questioned until counsel has been made available to him, unless the accused initiates further communication, exchanges, or conversations with the police.  *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386 (1981); *State v. Ikaika,* 67 Haw. 563, 566, 698 P.2d 281, 284 (1985); *State v. Brezee,* 66 Haw. 162, [164,] 657 P.2d 1044, 1046 (1983).[7]

> This principle creates a bright-line rule that once the right to counsel has been invoked all questioning must cease.  *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488, 495 (1984) (per curiam).  *See also Solem v. Stumes,* 465 U.S. 638, 646, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579, 589 (1984).

> . . .  The questioning should have stopped once [Mailo] indicated he wished to have a lawyer present.

> We hold that the trial court's determination that [Mailo's] answer was ambiguous is clearly erroneous.  *See State v. Sujohn,* 5 Haw.App. [459], 697 P.2d 1143 (1985).

> We further hold that the use of the unsuppressed statements was not harmless

error beyond a reasonable doubt.  *State v. Amorin,* 61 Haw. 356, 604 P.2d 45 (1979); *State v. Napeahi,* 57 Haw. 365, 556 P.2d 569 (1976).

*Id.* at 53, 731 P.2d at 1266.

I believe, given the interrogating officer's lack of independent recollection and the defendant's statement, "Nah, 'as all right," immediately following his invocation of his right to counsel, that but for the fact that Mailo's interrogation was transcribed this court would have been hard pressed to vindicate his constitutional rights.[8]  This further reinforces the efficacy of the *Stephan* rule, especially in light of the fact that it is so easily implemented, imposes no inconvenience on the police, and only costs the price of an audio or video tape.

---

7. Although *Brezee* does not comment on the subject, the *Ikaika* decision expressly reflects that the defendant's custodial statement was transcribed.  *Ikaika,* 67 Haw. at 565, 698 P.2d at 283.  The same was true in *Hoey. Hoey,* 77 Hawai'i at 21–22, 25–26, 881 P.2d at 508–09, 512–13.

8. This observation applies equally to *equivocal* invocations of the right to counsel during custodial interrogations, such as "I don't have the money to buy [a lawyer]," which we have held to trigger an obligation on the part of the interrogating officer to clarify a suspect's statement.  *Hoey,* 77 Hawai'i at 22, 36–37, 881 P.2d at 509, 523–24.