29 P.3d 919

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Wilfred Lowell GARCIA,
Defendant–Appellee.**

**No. 23513.**

Supreme Court of Hawai'i.

Aug. 10, 2001.

Deborah L. Kim, Deputy Public Defender, on the briefs, for defendant-appellant.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, and ACOBA, JJ.; and NAKAYAMA, J., dissenting, with whom RAMIL, J., joins.

### Opinion of the Court by ACOBA, J.

We hold that Plaintiff–Appellant State of Hawai'i (the prosecution) has not demonstrated any compelling justification for overruling *Gray v. Administrative Director of the Court, State of Hawai'i*, 84 Hawai'i 138, 931 P.2d 580 (1997), and *State v. Wilson*, 92 Hawai'i 45, 987 P.2d 268 (1999), especially in light of the legislative adoption in Hawai'i Revised Statutes (HRS) § 286–261(b). (Supp. 2000) of the *Gray* rationale. We hold, further, that the holding in *Wilson* must be applied retroactively to all other similarly situated defendants whose cases were not final at the time *Wilson* was decided. The May 19, 2000 findings of fact, conclusions of law, and order of the district court of the first circuit (the court) in the instant case [1] were consistent with the foregoing propositions. We therefore affirm its grant of the motion to suppress the intoxilyzer result filed by Defendant–Appellee Wilfred Lowell Garcia (Defendant).

### I.

At around 12:50 a.m. on September 5, 1999, Defendant was stopped and arrested for driving under the influence of intoxicating liquor (DUI), HRS § 291–4(a)(2) (Supp. 1999).[2] The arresting officer read Defendant the following excerpt from Honolulu Police Department (HPD) Form 396B:

Pursuant to the Administrative Driver's License Revocation Law, I must inform you (arrestee) of the following:

. . . .

That if you refuse to take any tests the consequences are as follows:

1. If your driving record shows no prior alcohol enforcement contacts during the five years preceding the date of your arrest, *your driving privileges will be revoked for one year instead of the three month revocation that would apply if you chose to take a test and failed it* [.]

. . . .

Defendant placed his initials next to the foregoing statement and next to the words "AGREED TO TAKE BREATH TEST" on the form. The arresting officer signed the

---

1. The presiding judge in this case was the Honorable Russell Blair.

2. HRS § 291–4(a)(2) provides as follows:

   **Driving under the influence of intoxicating liquor.** (a) A person commits the offense of driving under the influence of intoxicating liquor if:
   
   . . . .
   
   (2) The person operates or assumes actual physical control of the operation of any vehicle with .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood or .08 or more grams of alcohol per two hundred ten liters of breath.

   Effective January 1, 2002, Part XIV of HRS chapter 286, comprising of HRS §§ 286–251 to –266, will be repealed. *See* 2000 Haw. Sess. L. Act 189, §§ 29 and 41, at 432–33.

   Defendant was also charged with driving without no-fault insurance, HRS § 431:10C–104 (Supp.2000), operation of a vehicle without a certificate of inspection, HRS § 286–25 (1993), and being delinquent on payment of the motor vehicle tax, HRS § 291C–32(a)(3)(A) (1993). These other charges are not subjects of this appeal.

form. Subsequently, a HPD officer administered a blood alcohol concentration (BAC) test using a sample of Defendant's breath.

On January 28, 2000, Defendant moved to suppress the test result. In his supporting memorandum, Defendant argued that the informational statement read to him from HPD Form 396B was identical to the one found faulty in *Wilson* and, based on the holding in that case, the court should suppress the test result. On February 9, 2000, the prosecution filed a memorandum in opposition to Defendant's motion to suppress.

At a February 25, 2000 hearing on Defendant's motion to suppress, the court granted Defendant's motion. On May 19, 2000, the court filed its findings of fact, conclusions of law and order. The conclusions stated as follows:

### CONCLUSIONS OF LAW

1. Before the breath alcohol concentration test was administered, Defendant was not accurately informed by a police officer of the sanctions under HRS [c]hapter 286 "... Part XIV and HRS § 286–151.5 and 286–157.3" as required by HRS § 286–151(b).

2. The Hawaii Supreme Court's holding in *State v. Wilson*, 92 Hawai'i 45, 987 P.2d 268 (1999), is applicable to this case (i.e., "... that the information conveyed to Wilson regarding his rights under chapter 286 was inaccurate and misleading, Wilson was precluded from knowingly and intelligently consenting to the blood alcohol test in violation of HRS chapter 286.") *Id.* [a]t 22–23.

3. Here, as in *Wilson*, before the alcohol concentration test was administered, the defendant was not accurately informed by a police officer of the sanctions under HRS [c]hapter 286 "... Part XIV and HRS § 286–151.5 and 286–157.3" as required by HRS § 286–151(b).

4. Here, as in *Wilson*, the information concerning the sanctions under HRS [c]hapter 286 "... Part XIV and HRS § 286–151.5 and 286–157.3" that [was] conveyed to the defendant was inaccurate and misleading, and the defendant was precluded from knowingly and intelligently consenting to the alcohol concentration test in violation of HRS chapter 286.

5. Here, as in *Wilson*, the failure to comply with the requirements of HRS § 286–151(b) constitutes a "per se violation" and it is not necessary for the defendant to prove that the defendant was mislead [sic] regarding his rights under chapter 286.

6. The [c]ourt has considered the three-prong test for fairness described by the Hawaii Supreme Court in *State v. Ikezawa*, 75 Haw. 210, 857 P.2d 593 (1993), and will give retroactive effect to those cases which are presently pending.

7. This case was "pending" at the time the *Wilson* decision was issued because it was in the pretrial stage of the proceedings (as opposed to a "nonpending" case in which the defendant had already been convicted, and in which the time for the filing of an appeal from the judgment of conviction had already elapsed).

On May 31, 2000, the prosecution filed its notice of appeal.

### II.

The prosecution raises the following arguments: (1) *Wilson* was based on a misinterpretation of HRS § 286–261 by *Gray*;[3] (2) assuming *arguendo Gray* is not overruled, *Wilson* was wrongly decided; and (3) if *Wilson* is not overruled, it should not be retroactively applied.

---

3. The prosecution contends that *Gray* misinterpreted HRS § 286–261(b) as follows: (1) the plain language of HRS § 286–261(b) does not support this court's analysis in *Gray*; (2) *Gray* does not carry out the legislature's intent; (3) *Gray*'s "judicial legislation" is prohibited under the doctrine of separation of powers; (4) "the ... legislature intended to remove the Director's authority to impose revocation periods greater than those specifically articulated in [HRS] § 286–261(b)"; and (5) "in light of the plain language of [HRS] § 286–261(b) and the recognized intent of the legislature," *Gray*'s reliance on "non[-]dispositive" legislative history is unpersuasive.

### III.

The relevant issue in *Gray* was whether and to what extent the Administrative Director of the Court, State of Hawai'i (the Director) was authorized to determine the periods of administrative driver's license revocation under HRS § 286–261 (1993).[4] *See* 84 Hawai'i at 148, 931 P.2d at 590. This version of the statute provided in pertinent part as follows:

> (b) The periods of administrative revocation [for arrestees [5]] which *may* be imposed under this part are as follows:
>
> (1) *Three months,* if the arrestee's driving record shows *no prior alcohol enforcement contacts* during the five years preceding the date of arrest;
>
> (2) *One year* if the arrestee's driving record shows *one prior alcohol enforcement contact* during the five years preceding the date of arrest;
>
> (3) *Two years* if the arrestee's driving record shows *two prior alcohol enforcement contacts* during the seven years preceding the date of arrest;
>
> . . . .
>
> (c) The license of an arrestee who refuses to be tested after being informed of the sanctions of this part *shall* be revoked under subsection (b)(1), (2), or (3) for a period of one year, two years, and four years, respectively.

(Emphases added.) Discerning an ambiguity between the use of the word "may" in subsection (b) and the effect to be given to the word "shall" in subsection (c), this court construed the two terms in *pari materia*, *see Gray,* 84 Hawai'i at 148–50, 931 P.2d at 590–92, and, in light of legislative history, concluded that (1) "[p]ursuant to HRS § 286–261(b), . . . the Director is accorded the discretionary authority to increase the minimum periods of administrative revocation for 'nonrefusing' arrestees [(those arrestees who

have consented to a BAC test and failed it)], as enumerated in subsections (b)(1), (b)(2), and (b)(3)," *id.* at 159–60, 931 P.2d at 601–02, and (2) "the Director's discretion[ ] . . . to increase [such] periods . . . pursuant to HRS § 286–261(b) [was] 'capped' by the mandatory and nondiscretionary periods enumerated in HRS § 286–261(c)." *Id.* at 160–61, 931 P.2d at 602–03 (footnote omitted).

Thus, under *Gray,* "if an arrestee with no prior alcohol enforcement contacts during the five years predating the date of arrest consents to a blood [or breath] test and fails, he or she may face revocation of his or her driving privileges from three months *up to one year.*" *Wilson,* 92 Hawai'i at 49, 987 P.2d at 272 (citing HRS § 286–261(b)(1) and (c) (Supp.1998)) (emphasis added). Correspondingly, under HRS § 286–261(b)(2), "if an arrestee with [one] prior alcohol enforcement contact during the five years predating the date of arrest consents to a blood [or breath] test and fails, he or she may face revocation of his or her driving privileges from [one year] up to two year[s]," and, under HRS § 286–261(b)(3), "if an arrestee with [two] prior alcohol enforcement contacts during the [seven] years predating the date of arrest consents to a blood [or breath] test and fails, he or she may face revocation of his or her driving privileges from [two years] up to [four] year[s]." *Wilson,* 92 Hawai'i at 49, 987 P.2d at 272. *Gray* was a unanimous opinion of this court. The State did not move for reconsideration of the opinion.

### IV.

In *Wilson,* this court applied its holding in *Gray* to the advice given by police officers in requesting a driver's consent to a BAC test. In that case, Wilson was informed that "if [he] refuse[d] to take any [BAC] tests[,] . . . [his] driving privileges *will be revoked for one year instead of the three month revoca-*

---

4. As stated *infra,* the legislature amended HRS § 286–261 in 2000. *See infra* Part V. There were no amendments between 1993 and 2000 except for "minor grammatical changes to HRS §§ 286–261(b) and (c)" in 1995. *Gray,* 84 Hawai'i at 140 n. 4, 931 P.2d at 583 n. 4 (citing 1995 Haw. Sess. L. Act 226, § 7, at 585–86).

5. " 'HRS § 286–261(b) . . . deals with a consequence of administrative revocation[,] *i.e.,* the period of administrative revocation applicable to arrestees who have consented to be tested for blood alcohol concentration[.]' " *Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 20, 904 P.2d 893, 905 (1995) (citation and internal quotation marks omitted)) (brackets omitted).

*tion* that would apply if [he] chose to take the test and failed it." 92 Hawai'i at 47, 987 P.2d at 270 (some emphasis added and some deleted). Since under *Gray* 's interpretation of HRS § 286-261(b), "Wilson was subject to revocation for three months *to a year* by consenting to and failing [the test]," *id.* (emphasis added), this court concluded that the officer's advice "was inaccurate and misleading and did not fully inform Wilson· of the legal consequences of submitting to a blood test." *Id.* at 46, 987 P.2d at 269 (footnote omitted). Viewing the misleading information as "relevant to his decision whether to agree to or refuse the blood alcohol test[,]" a majority of this court—Chief Justice Moon and Justices Klein and Levinson—concluded that Wilson "did not make a knowing and intelligent decision whether to exercise his statutory right of consent or refusal." *Id.* at 51, 987 P.2d at 274.

Citing *State v. Pattioay,* 78 Hawai'i 455, 467, 896 P.2d 911, 923 (1995), the *Wilson* majority noted that "the exclusion of evidence based on a statutory violation is proper under appropriate circumstances" and that "[s]uch exclusion is appropriate here." 92 Hawai'i at 52 n. 10, 987 P.2d at 276 n. 10. In *Pattioay,* this court suppressed evidence obtained in violation of the Posse Comitatus Act (PCA), 18 U.S.C. § 1385 (1988). The PCA provides that Army or Air Force personnel may not be used as a posse comitatus or otherwise to execute the laws except in cases and under circumstances expressly authorized by the Constitution or an Act of Congress. Penalties are prescribed for violation of the PCA. *See* 78 Hawai'i at 459 n. 5, 896 P.2d at 915 n. 5. In violation of the Act, undercover military police officers targeted civilians suspected of selling drugs to military personnel and obtained drugs as evidence against the civilians. *See id.* at 459, 896 P.2d at 915.

While acknowledging that "the PCA does not spawn personal rights[, and,] therefore, exclusion is not theoretically necessary as an added deterrent to the serious criminal sanctions provided in the PCA[,]" *id.* at 466, 896

P.2d at 922 (citations omitted), three members of this court believed that suppression was warranted "under the authority of this court's supervisory powers in the administration of criminal justice in the courts of our state." *Id.* at 469, 896 P.2d at 925. In arriving at that conclusion, they said that "actions of the military .... personnel ... clearly violated the PCA and were therefore illegal" and that "[e]vidence [thus] obtained" was "tainted." *Id.* Accordingly, the *Pattioay* majority concluded that "it is imperative in this case to suppress the evidence obtained in violation of the PCA because to ignore the violation and allow the evidence to be admitted would be to justify the illegality and condone the receipt and use of tainted evidence in the courts of this state." *Id.*[6]

In *Wilson,* the majority decided that, under a contrary position, "a police officer could give a driver arbitrary, false, or misleading information regarding a driver's rights under the implied consent law and still compel the admission of the results in the criminal context" and that "[c]learly, that cannot be the intended result of our implied consent statute." *Wilson,* 92 Hawai'i at 53, 987 P.2d at 276 (footnote omitted). As a result, the majority directed that "the arresting officer's violation of HRS chapter 286's consent requirement precludes admissibility of Wilson's blood test results in his related criminal DUI proceeding" and affirmed suppression of the test results, *id.* at 53–54, 987 P.2d at 276–77 (footnote omitted), under this court's supervisory powers as espoused in *Pattioay. See* 78 Hawai'i at 469, 896 P.2d at 925.

Justices Nakayama and Ramil dissented on the grounds that (1) "[t]he implied consent law neither creates a right of voluntary choice, nor does it condition the admissibility of test evidence in criminal DUI prosecutions on compliance with the statutory notice requirements[,]" *Wilson,* 92 Hawai'i at 58, 987 P.2d at 281, and (2) "the principles underlying the exclusionary rule" do not warrant suppression for a police officer's failure to inform an arrestee of "the possibility of revo-

6. Justice Ramil, joined by Chief Justice Moon, concurring, "agree[d] that the evidence obtained in violation of the PCA should be suppressed on adequate and independent state grounds via the

exclusionary rule as applied in the State of Hawai'i." *Pattioay,* 78 Hawai'i at 470, 896 P.2d at 926.

cation for a period between three months and a year if he [or she] consented to the test and failed it." *Id.* at 59–60, 987 P.2d at 282–83. The prosecution did not move for reconsideration.

## V.

In 2000, the legislature amended HRS § 286–261 to read, in pertinent part, as follows:

**Effective date and period of administrative revocation; criteria. . . .**

. . . .

(b) The periods of administrative revocation *with respect to a driver's license and motor vehicle registration, if applicable,* that [may] *shall* be imposed under this part are as follows:

(1) [Three] *A minimum of three* months[,] *up to a maximum of one year revocation of driver's license,* if the arrestee's driving record shows no prior alcohol enforcement contacts during the five years preceding the date of arrest;

(2) [One] *A minimum of one* year *up to a maximum of two years revocation of driver's license and all registrations of motor vehicles registered to the arrestee* if the arrestee's driving record shows one prior alcohol enforcement contact during the five years preceding the date of arrest;

(3) [Two] *A minimum of two* years *up to a maximum of four years revocation of driver's license and all registrations of motor vehicles registered to the arrestee* if the arrestee's driving record shows two prior alcohol enforcement contacts during the seven years preceding the date of arrest;

. . . .

[ (c)] *(d)* The *driver's* license of an arrestee who refuses to be tested after being informed of the sanctions of this part shall be revoked under subsection (b)(1), (2), [and] (3) . . . for a period of one year, two years, [and] four years, . . . respectively.

. . . .

2000 Haw. Sess. L. Act 189, § 16, at 401–02 (underscored sections added and bracketed sections deleted). The purpose of this amendment was to

codify[ ] existing appellate case law, (See *State v. Wilson,* 92 Hawai'i 45, 987 P.2d 268 (1999) and *Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 931 P.2d 580 (1997)) concerning the minimum and maximum periods of administrative revocation possible under section 286–261(b)(1)–(3), HRS[.]

Hse. Conf. Comm. Rep. No. 25, in 2000 House Journal, at 855. The amendment became effective on September 30, 2000. *See* 2000 Haw. Sess. L. Act 189, § 41(2), at 433.

## VI.

As mentioned earlier, the prosecution argues that *Gray* misinterpreted HRS § 286–261(b) and, thus, *Gray* and *Wilson,* which was engendered by *Gray,* were wrongly decided. When faced with that contention, we must determine whether the circumstances here require overruling the precedents established in *Gray* and *Wilson.*

### A.

Precedent is "[a]n adjudged case or decision of a court, considered as furnishing an example of authority for an identical or similar case afterwards arising or a similar question of law." *Black's Law Dictionary* 1176 (6th ed.1990). The "[p]olicy of courts to stand by precedent and not to disturb settled point[s]" is referred to as the doctrine of *stare decisis, id.* at 1406, and operates "as a principle of self-restraint . . . with respect to the overruling of prior decisions." *Robinson v. Ariyoshi,* 65 Haw. 641, 653 n. 10, 658 P.2d 287, 297 n. 10 (1982), *reconsideration denied,* 66 Haw. 528, 726 P.2d 1133 (1983). The benefit of stare decisis is that it "furnish[es] a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; . . . eliminat[es] the need to relitigate every relevant proposition in every case; and . . . maintain[s] public faith in the judiciary as a source of impersonal and reasoned judgments." *Id.* (citing *Moragne v. States Ma-*

*rine Lines, Inc.*, 398 U.S. 375, 403, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970)).

While "there is no necessity or sound legal reason to perpetuate an error under the doctrine of stare decisis[,]" *id.* (internal quotation marks and citation omitted), we agree with the proposition expressed by the United States Supreme Court that a court should "not depart from the doctrine of stare decisis without *some compelling justification.*" *Hilton v. South Carolina Pub. Ry. Comm'n,* 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) (emphasis added). *Cf. Dairy Road Partners v. Island Ins. Co., Ltd.,* 92 Hawai'i 398, 421, 992 P.2d 93, 116 (2000) (stating that "a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it") (internal quotation marks and citations omitted). Thus, "when th[e c]ourt reexamines a prior holding, its judgment is customarily informed by a series of prudential and pragmatic considerations designed to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case." *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 854, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). In this calculus, "[c]onsiderations of stare decisis have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and [the legislative branch] remains free to alter what we have done." *Hilton,* 502 U.S. at 202, 112 S.Ct. 560 (internal quotation marks and citation omitted).

#### B.

HRS § 286–261(b), as it existed prior to the 2000 amendment, was ambiguous. In *Gray,* this court arrived at a construction of HRS § 286–261(b) that fell within the reasoned interpretative choices available. After *Gray* was decided, the State did not request reconsideration of the decision. In *Wilson,* the majority concluded that suppression of a BAC test result was required when the advice to an arrestee constituted a misstatement of possible HRS § 286–261(b) sanctions for consenting to take a BAC test and failing

it. This conclusion was based at least in part in maintaining the integrity of the judicial system, *see Pattioay,* 78 Hawai'i at 469, 896 P.2d at 925, an established proposition our courts have adhered to in other cases. *See State v. Bridges,* 83 Hawai'i 187, 196, 925 P.2d 357, 366 (1996) (stating that, in Hawai'i, judicial integrity has been recognized as one of the purposes underlying our exclusionary rule and that "[t]he 'judicial integrity' purpose of the exclusionary rule is essentially that the courts should not place their imprimatur on evidence that was illegally obtained by allowing it to be admitted into evidence in a criminal prosecution") (citation omitted); *State v. Bowe,* 77 Hawai'i 51, 59 & n. 7, 881 P.2d 538, 546 & n. 7 (1994) (holding that the court will not participate in allowing coerced statements to be used as evidence even though no state action is involved in coercion); *State v. Augafa,* 92 Hawai'i 454, 470, 992 P.2d 723, 739 (App.1999) (stating that evidence may be suppressed "to protect the court's independence, integrity, and to insure a fair litigation process"). The prosecution did not request reconsideration of the *Wilson* decision.

Three years following the *Gray* decision and a year after the *Wilson* decision, the legislature ratified the *Gray* construction and amended HRS § 286–261(b) accordingly. In doing so, the legislature explained that it was adopting "existing appellate case law," referring to *Gray* and *Wilson.* Hse. Conf. Comm. Rep. No. 25, in 2000 House Journal, at 855. As a result of the amendment, the propositions established in *Gray,* and relied on in *Wilson,* are now essentially embodied in HRS § 286–261(b). The course advocated by the prosecution would call into question the recent legislative amendment that expressly conformed to this court's decisions in *Gray* and in *Wilson.* Adherence to the principle of "[s]tare decisis has added force when the legislature, in the public sphere, and citizens, in the private realm, have acted in reliance on a previous decision, for in this instance overruling the decision would dislodge settled rights and expectations or require an extensive legislative response." *Hilton,* 502 U.S. at 202, 112 S.Ct. 560. Thus, "prudential and pragmatic considerations[,]"

*Casey,* 505 U.S. at 854, 112 S.Ct. 2791, arising since their promulgation, in themselves, dissuade us from overruling *Gray* and *Wilson.* In light of this history, we do not believe that the prosecution has mustered a "compelling justification" for departing from the doctrine of stare decisis. *Hilton,* 502 U.S. at 202, 112 S.Ct. 560.

### VII.

Our reaffirmance of *Wilson* as binding precedent disposes of the prosecution's challenges to its holding, most of which resurrect arguments either expressly or impliedly rejected by the *Wilson* majority. The prosecution contends that (1) "[t]he implied consent statute does not give defendants a right to refuse an alcohol test performed as a lawful incident to arrest for DUI"; (2) "an incorrect warning alone is [in]sufficient to require suppression of the alcohol test results"; and (3) there is "no indication a warning that [correctly] apprised him . . . would have changed [Defendant's] decision to take the alcohol test in any way." However, in *Wilson,* a majority of this court rejected the same arguments. The *Wilson* majority affirmed that "a driver's 'implied consent' to an evidentiary chemical alcohol test is qualified by his or her implied right to refuse such a test." 92 Hawai'i at 49, 987 P.2d at 272. It adopted the rule that "[an] arresting officer's violation of HRS chapter 286's consent requirement precludes admissibility of [an arrestee]'s blood test results in his [or her] related criminal DUI proceeding." *Id.* at 53–54, 987 P.2d at 276–77 (footnote omitted). It impliedly eschewed the dissent's contention that "Wilson has never asserted that he would have refused the test had he received a full explanation of the penalties under *Gray.*" *Id.* at 60, 987 P.2d at 282.

With respect to the foregoing statement contained in the *Wilson* dissent, the Intermediate Court of Appeals (the ICA) has recently opined that "[t]he majority opinion was silent on the question of the defendant's reli-ance on and prejudice" from the faulty advice. *Santos v. Administrative Director of the Court,* 95 Hawai'i 86, 92, 18 P.3d 948, 954 (App.2001). We must disagree with the ICA. That question did not survive the holding in *Wilson.* Suppression rested on the majority's belief that the misleading information legally precluded an arrestee from making "a knowing and intelligent decision [regarding] whether to consent to or refuse a blood test." *Wilson,* 92 Hawai'i at 52 n. 9, 987 P.2d at 275 n. 9. Consequently, prejudice inhered in the failure of the police to properly render a complete explanation of the penalties to the driver in the first place.[7] This infirmity was seen as tainting the arrestee driver's decision and the resulting BAC test result. The inquiry suggested by the ICA in *Santos* would be incompatible with the *Wilson* rationale. To the extent that *Santos* conflicts with our decision in the instant case, we are constrained to overrule it.

### VIII.

#### A.

■ Relying on *State v. Ikezawa,* 75 Haw. 210, 857 P.2d 593 (1993), the prosecution maintains that if we sustain *Gray* and *Wilson,* we should not afford *Wilson* retroactive effect. On the other hand, Defendant contends that (1) *Wilson* is not a new rule, but a mere application of *Gray*'s interpretation of HRS § 286–261, and (2) if *Wilson* is regarded as a new rule, it must be applied retroactively under *State v. Jackson,* 81 Hawai'i 39, 912 P.2d 71 (1996). We disagree with the argument that a mere application of *Gray* must have led necessarily to *Wilson*'s holding that "the arresting officer's violation of HRS chapter 286's consent requirement precludes admissibility of Wilson's blood test results." *Wilson,* 92 Hawai'i at 53–54, 987 P.2d at 276–77 (footnote omitted). A majority of this court could have applied *Gray* and concluded that the violation would not require suppression as the dissent in *Wilson* would have held. Thus, *Wilson* established a

---

7. The prosecution contends that Defendant did not suffer any "prejudice" because Defendant received a three-month revocation as he had been informed. Even if a defendant's ultimate revocation period did not exceed three months, the sanction ultimately imposed after taking the test has nothing to do with the defendant's right to be properly advised so as to enable the defendant to make an informed decision.

new suppression rule based on a violation of HRS § 286–261(b).[8] For the reasons that follow, however, we believe that *Wilson* must be given retroactive effect.

## B.

Courts may resolve the retroactivity issue in three ways. "First, a decision may be made fully retroactive, applying both to the parties before the court and to all others by and against whom claims may be pressed. . . . This practice is overwhelmingly the norm[.]" *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 535, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (citing *Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 372, 30 S.Ct. 140, 54 L.Ed. 228 (1910) (Holmes, J., dissenting)), *superceded by statute on other grounds as stated in Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 751 (2d Cir.1992). This principle is "consistent with res judicata[,] procedural barriers such as statutes of limitations," *id.*, and "the traditional function of the courts to decide cases before them based upon their best current understanding of the law." *Id.* (citing *Mackey v. United States*, 401 U.S. 667, 679, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in part and dissenting in part)). The drawback of this approach is that "in some circumstances retroactive application may prompt difficulties of a practical sort[ because the method] fail[s] to take account of reliance on cases subsequently abandoned[.]" *Id.* at 536, 111 S.Ct. 2439.

"Second, there is the purely prospective method of overruling, under which a new rule is applied neither to the parties in the lawmaking decision nor to those others against or by whom it might be applied to conduct or events occurring before that decision." *Id.*

In this formulation, "[t]he case is decided under the old law but becomes a vehicle for announcing the new, effective with respect to all conduct occurring after the date of that decision." *Id.* "This approach claims justification in its appreciation that '[t]he past cannot always be erased by a new judicial declaration,' . . . and that to apply the new rule to parties who relied on the old would offend basic notions of justice and fairness." *Id.* (quoting *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 374, 60 S.Ct. 317, 84 L.Ed. 329, *reh'g denied*, 309 U.S. 695, 60 S.Ct. 581, 84 L.Ed. 1035 (1940), and citing *Lemon v. Kurtzman*, 411 U.S. 192, 199, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) (plurality opinion)). "But this equitable method has its own drawback: it tends to relax the force of precedent, by minimizing the costs of overruling, and thereby allows the courts to act with a freedom comparable to that of legislatures." *Id.* at 536–37, 111 S.Ct. 2439 (citing *United States v. Johnson*, 457 U.S. 537, 554–55, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982); *James v. United States*, 366 U.S. 213, 225, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961) (Black, J., concurring in part and dissenting in part)).

Third, "a court may apply a new rule in the case in which it is pronounced, then return to the old one with respect to all others arising on facts predating the pronouncement. This method[ is called] modified, or selective, prospectivity[.]" *Id.* at 537, 111 S.Ct. 2439. In United States Supreme Court decisions, selective prospectivity was said to have "enjoyed its temporary ascendancy in the criminal law during a period in which the Court formulated new rules, prophylactic or otherwise, to insure protection of the rights of the accused." *Id.* (citing *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct.

---

**8.** The prosecution maintains that *Wilson* overrules *Rossell v. City and County of Honolulu*, 59 Haw. 173, 579 P.2d 663 (1978). Rossell had brought a civil tort suit for injuries suffered during the forcible drawing of blood from him by police and city employees. *See id.* at 175–76, 579 P.2d at 665–66. This court rejected the City and its employees' claim that the admission of the blood alcohol test results in Rossell's criminal DUI case "estopped" Rossell from "relitigating in [the] civil suit the issue of the legality of the blood sample." *Id.* at 187, 579 P.2d at 672. The court acknowledged that "in a criminal con-

text[,] . . . the . . . propriety of admission of evidence obtained in violation of a statute ordinarily involves issues which are separate and distinct from those involved in a determination of civil liability for failure to comply with the requirements of that statute." *Id.* However, it related that, "[g]enerally, where evidence has been obtained in violation of a statute, that evidence is *not inadmissible per se* in a criminal proceeding unless the statutory violation has constitutional dimensions." *Id.* (citation omitted). To the extent that such dictum conflicts with the specific holding in *Wilson, Wilson* must control.

1772, 16 L.Ed.2d 882, *reh'g denied,* 385 U.S. 890, 87 S.Ct. 12, 17 L.Ed.2d 121 (1966); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), *overruled by Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *Daniel v. Louisiana,* 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975); *American Trucking Ass'ns, Inc. v. Smith,* 496 U.S. 167, 198, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990) ("During the period in which much of our retroactivity doctrine evolved, most of the Court's new rules of criminal procedure had expanded the protections available to criminal defendants.")).

The Court's rationale for employing selective prospectivity was to avoid disruptions of the administration of criminal law, while at the same time fostering review by applying the new rule to the case in which the rule was announced. *See id.* The drawback of selective prospectivity is that it "breaches the principle that litigants in similar situations should be treated the same, a fundamental component of stare decisis and the rule of law generally." *Id.* (citation omitted). According to the Court, "[it] departs from this basic judicial tradition when [it] simply pick[s] and choose[s] from among similarly situated defendants those who alone will receive the benefit of a 'new' rule of constitutional law." *Id.* at 537–38, 111 S.Ct. 2439 (internal quotation marks and citations omitted).[9]

Inasmuch as this court applied *Wilson's* new exclusionary rule to Wilson based on the violation by the police of HRS § 286–261(b),

we are not concerned with the second method, pure prospectivity. The prosecution in effect argues for selective prospectivity, in which the *Wilson* holding would apply to Wilson only, but not to others whose cases were pending at the time of the decision in his case.

## IX.

Because our case law on the retroactive application of court-rendered rules has extensively drawn on federal decisions, it is instructive to capsulize the evolution of the United States Supreme Court decisions in this area. It was initially thought by the Court that "[t]he [United States] Constitution neither prohibits nor requires retrospective effect" and "the [c]ourt's task is to exercise its discretion, weighing the merits and demerits of retroactive application of the particular rule." *Linkletter v. Walker,* 381 U.S. 618, 629, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), *overruled by Griffith, supra.* In *Linkletter,* the Court announced that there is "no distinction ... between civil and criminal litigation" and that "the accepted rule ... is that in appropriate cases the Court may in the interest of justice make the rule prospective."[10]  *Id.* at 627–28, 85 S.Ct. 1731.

Following *Linkletter* and subsequent cases, the Court in *Stovall* "clarified [*Linkletter's*] criteria," R. Fellon & D. Meltzer, *New Law, Non–Retroactivity, and Constitutional Remedies,* 104 Harv. L.Rev. 1731, 1741 (1991), setting forth, "(a) the purpose to be served by the new standards, (b) the extent of the

---

**9.** For example, Justice Blackmun, joined by Justices Marshall and Scalia, had contended that "[t]he nature of judicial review constrains us to consider the case that is actually before us, and, if it requires us to announce a new rule, to do so in the context of the case and apply it to the parties who brought us the case to decide" and that "[t]o do otherwise is to warp the role that we, as judges, play in a Government of limited powers." *Beam Distilling,* 501 U.S. at 547, 111 S.Ct. 2439 (Blackmun, J., concurring). Similarly, in the view of Justices Black and Douglas, "prospective lawmaking is the function of Congress rather than of the ·courts." *James,* 366 U.S. at 225, 81 S.Ct. 1052 (Black, J., concurring in part and dissenting in part).

**10.** In *Linkletter,* the Court did not give retroactive effect to the new rule announced in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d

1081, *reh'g denied,* 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d 72 (1961), that is, that the due process clause of the fourteenth amendment requires state courts to exclude evidence seized in violation of the fourth amendment. *See* 381 U.S. at 639–40, 85 S.Ct. 1731. The Court reasoned that (1) "[the] purpose [of the *Mapp* rule] would not be advanced by making the rule retroactive," *id.* at 637, 85 S.Ct. 1731, (2) "both the accused and the States relied upon [old precedent]" and the purpose of the rule "will not at this late date be served by the wholesale release of the guilty victims [of illegal searches]," *id.,* and (3) "[t]o make the rule of *Mapp* retrospective would tax the administration of justice to the utmost" because the *Mapp* rule is "an extraordinary procedural weapon that has no bearing on guilt." *Id.* at 637–38, 85 S.Ct. 1731.

reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards" as the factors to be considered in deciding whether or not a new principle should be made retroactive.[11] *Stovall*, 388 U.S. at 296–97, 87 S.Ct. 1967.[12] The result of utilizing such factors was that "[w]here the Court ... expressly declared a rule of criminal procedure to be a clear break with the past, it almost invariably [went] on to find such a newly minted principle nonretroactive." *Griffith*, 479 U.S. at 324, 107 S.Ct. 708 (internal quotation marks and citations omitted). This was because "[o]nce the Court ... found that the new rule was unanticipated, the second and third *Stovall* factors—reliance by law enforcement authorities on the old standards and effect on the administration of justice of a retroactive application of the new rule—... virtually compelled a finding of nonretroactivity." *Id.* at 325, 107 S.Ct. 708 (internal quotation marks and citations omitted).

The United States Supreme Court "subsequently overruled *Linkletter* [and *Stovall*] in *Griffith*, and eliminated limits on retroactivity in the criminal context[,]" *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 95, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), commanding that "a new [constitutional] rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Griffith*, 479 U.S. at 328, 107 S.Ct. 708.[13] Thus, the Court abandoned the multifactor approach that was the hallmark of the *Linkletter* and *Stovall* decisions. The *Griffith* "holding rested on 'two basic norms of constitutional adjudication' ": (1) " 'the nature of judicial review' strips [the Court] of the quintessentially 'legislat[ive]' prerogative to make rules of law retroactive or prospective as [the Court] see[s] fit"; and (2) " 'selective application of new rules violates the principle of treating similarly situated [parties] the same.' " *Harper*, 509 U.S. at 95, 113 S.Ct. 2510 (quoting *Griffith*, 479 U.S. at 323, 107 S.Ct. 708). Reaffirming the *Griffith* principle in *Powell v. Nevada*, 511 U.S. 79, 84, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994), the Court directed that its decision in *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991),[14] must be

11. "In the civil context, [the United States Supreme Court] ... permitted the denial of retroactive effect to 'a new principle of law' if such a limitation would avoid 'injustice or hardship' without unduly undermining 'the purpose and effect' of the new rule." *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 94, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (quoting *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (internal quotation marks and citation omitted)). *Harper* superceded the *Chevron Oil* analysis, concluding that

> [w]hen this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

*Id.* at 97, 92 S.Ct. 349. Retroactivity of civil decisions is not an issue in this case.

12. In *Stovall*, the Court refused to apply a new rule established in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L Ed.2d 1149 (1967), and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), "requiring the exclusion of identification evidence which is tainted by exhibiting the accused to identifying witnesses before trial in the absence of his [or her] counsel," *Stovall*, 388 U.S. at 294, 87 S.Ct. 1967, because the "retroactive application of *Wade* and *Gilbert* would seriously disrupt the administration of our criminal laws." *Id.* at 300 87 S.Ct. 1967 (internal quotation marks and citation omitted).

13. The issue in *Griffith* was "whether [the United States Supreme Court's] ruling in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),] is applicable to litigation pending on direct state or federal review or not yet final when *Batson* was decided." 479 U.S. at 316, 107 S.Ct. 708. In *Batson*, the Court held that (1) "a defendant in a state criminal trial could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment, based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire," and (2) "once the defendant had made the prima facie showing, the burden shifted to the prosecution to come forward with a neutral explanation for those challenges." *Id.* *Griffith* pronounced that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final," and, thus, *Batson* was applied retroactively. *Id.* at 328, 107 S.Ct. 708.

14. *McLaughlin* held that a delay exceeding forty-eight hours between an arrest without a warrant and a probable cause determination presumptively violates the fourth amendment. *See* 500 U.S. at 56–57.

applied retroactively. *See Powell*, 511 U.S. at 83–85, 114 S.Ct. 1280.

### X.

■ We adhere to the view that "[w]hen questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions." *Smith*, 496 U.S. at 177, 110 S.Ct. 2323 (plurality opinion) (citing *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364, 53 S.Ct. 145, 77 L.Ed. 360 (1932) ("We think the federal constitution has no voice upon the subject [of whether a state court may decline to give its decisions retroactive effect].")). However, the development of our law on retroactivity has paralleled that of the federal cases in large respect.

Rather than utilizing the *Linkletter* and *Stovall* factors in *State v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971), this court agreed with Justice Harlan's dissents in *Mackey* and *Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), *overruled by Griffith*, *supra*, and gave full retroactive effect to its constitutionally-based decision by extending it not only to the defendant in the case announcing that rule, but also to all other defendants whose cases were pending. *See Santiago*, 53 Haw. at 270–71, 492 P.2d at 667 (citing *Mackey*, 401 U.S. at 695–702, 91 S.Ct. 1160 (Harlan, J., dissenting); *Desist*, 394 U.S. at 255–56, 89 S.Ct. 1030 (Douglas, J., dissenting), 258–59 (Harlan, J., dissenting)). Santiago was originally tried in 1970. *See id.* at 267, 492 P.2d at 665 (citations omitted). During the pendency of Santiago's case, this court decided *State v. Cuevas*, 53 Haw. 110, 488 P.2d 322 (1971). In *Cuevas*, HRS § 748–3 (1968), which provided that "[w]hen the act of killing another is proved, malice aforethought shall be presumed, and the burden shall rest upon the party who committed the killing to show that it did not exist, or a legal justification or extenuation therefor" was declared invalid. *Id.* at 111, 115–16, 488 P.2d at 323, 325. This court confirmed that HRS § 748–3 violated the due process "right of an accused to be convicted only upon proof by the prosecution of all the elements of the crime charged against him beyond a reasonable doubt." *Id.* at 114–15, 488 P.2d at 325. A jury instruction drawn from HRS § 748–3 was not deemed harmless, and Cuevas's conviction was "reversed." *See id.* at 116, 488 P.2d at 325. An instruction like that in *Cuevas* was given in Santiago's case. *See Santiago*, 53 Haw. at 267–68, 492 P.2d at 665. Resting on the *Mackey* and *Desist* dissents, this court "applied [its] holding in *Cuevas* to [*Santiago*], as [it] applied it to other cases coming before the court on direct review." *Id.* at 271, 492 P.2d at 667 (citations omitted).

In *Russell v. Blackwell*, 53 Haw. 274, 492 P.2d 953 (1972), the petitioner, Russell, filed a petition for writ of habeas corpus in 1969 contesting the voluntariness of his plea. *See id.* at 276, 492 P.2d at 955. Russell had pleaded guilty and been sentenced in 1965. The question "turn[ed] on whether retroactive effect [would] be given to *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)," "which held that state courts may not assume from a silent record that a guilty plea had been voluntarily made." *Russell*, 53 Haw. at 277, 492 P.2d at 955–56. Reviewing certain factors from *Linkletter*[15] such as the "[p]rior history of the rule in question, its purpose and effect, and whether retroactive operation will further or retard its operation[,] interests in the administration of justice and the integrity of the judicial process[,]" *id.* at 277, 492 P.2d at 956, this court refused to apply *Boykin* in *Russell*. *See id.*

Subsequently, in *Ikezawa*, this court referred to the *Linkletter* and *Stovall* factors identified in *Santiago* and *Russell* but augmented its decision in two ways. First, emphasis was placed on "the concept of fairness," which was described as "implicit in the factors described in *Santiago* and *Russell* [.]" 75 Haw. at 220, 857 P.2d at 598. Hence, it was said that, "where substantial prejudice results from the retrospective application of new legal principles to a given set of facts, the inequity may be avoided by giving the guiding principles prospective application only." *Id.* at 221, 857 P.2d at 598 (footnote

---

15. *Russell* did not discuss "the reliance placed upon [old precedent]," one of the factors considered in *Linkletter*. 381 U.S. at 636, 85 S.Ct. 1731.

omitted). Second, *Ikezawa* considered substantial prejudice in the context of a defendant's reliance on overruled precedent. *See id.* at 222, 857 P.2d at 599. Because "[r]etroactive application of [the new decision] would[ ] . . . produce a substantially inequitable result" for the defendant,[16] *id.* at 223, 857 P.2d at 599, the new decision was not applied to Ikezawa.

The same approach was resorted to in *State v. Nakata*, 76 Hawai'i 360, 878 P.2d 699, *reconsideration denied*, 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). *Nakata* dealt with reserved questions of law from the circuit court as to (1) whether Act 128 of the 1993 Hawai'i Session Laws eliminated the right to jury trial for HRS § 291-4 [17] defendants charged with driving under the influence of alcohol, and (2) if so, whether the Act might be applied retroactively to alleged offenses occurring prior to its enactment. As to the first two questions, it was concluded that the Act eliminated the right to jury trial and that its provisions applied retroactively.

In connection with the second question, the appellants questioned whether this court's decision with respect to the foregoing issues could be applied retroactively. *See id.* at 363, 377, 878 P.2d at 702, 716. Addressing whether retroactive application would violate due process, *Nakata* acknowledged that *Griffith*'s overruling of *Linkletter* "could call into question our continued adherence to *Ikezawa*." *Id.* at 378, 878 P.2d at 717. The *Nakata* court nevertheless chose "to continue to follow" *Ikezawa*'s "more flexible test" on "independent state grounds." *Id. Ikezawa* was described as having decided that "the defendant was substantially prejudiced by his reliance on previous precedent." *Id.* Comparing the retroactive effect which befell the defendant in *Ikezawa* with that which might impact the *Nakata* defendants, it was concluded that the *Nakata* defendants had "failed to show how they would be substantially prejudiced by the retroactive application of the act" and, thus, that "retroactive application of [its] decision to pending cases passes the test enunciated in *Ikezawa*." *Id.*

In *Jackson*, the question whether to give retroactive effect to a new rule announced in *State v. Hoey*, 77 Hawai'i 17, 881 P.2d 504 (1994), arose. Like *Ikezawa* and *Nakata*, *Hoey* did not involve a new constitutional rule.[18] *Hoey* had held that time periods

---

**16.** Ikezawa was arrested and charged with third degree assault on March 23, 1990. *See* 75 Haw. at 213, 857 P.2d at 595. After the trial court dismissed the charge of third degree assault, Ikezawa was indicted for second degree assault on June 12, 1991, based on the same incident as the previous charge. *See id.* The trial was set for December 2, 1991. *See id.* Because there would be more than six months between his arrest and trial, Ikezawa moved to dismiss the charge pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 48(b)(1), relying on the interpretation of the rule at the time.

Ikezawa apparently depended on *State v. Stone*, 65 Haw. 308, 651 P.2d 485 (1982), which held that when a defendant is arrested and charged, the six-month period under HRPP Rule 48 for bringing the defendant to trial commenced to run even though the original charge was subsequently dismissed on the prosecution's motion. *See id.* at 309, 651 P.2d at 486. The trial court denied Ikezawa's motion, trial commenced on December 2, 1991, and Ikezawa was convicted of the lesser included offense of third degree assault. *See Ikezawa*, 75 Haw. at 213, 857 P.2d at 595.

On March 19, 1992, this court decided *State v. Balauro*, 73 Haw. 70, 828 P.2d 267 (1992). *Balauro* overruled *Stone*, determining that, under HRPP Rule 48(c)(6), the six-month speedy trial period is tolled between the dismissal of an original charge and filing of a different charge when the later charge is the same as or is required to be joined with the original charge. *See id.* at 71, 828 P.2d at 268. Retroactive application of *Balauro* would have substantially prejudiced Ikezawa because: (1) "he correctly looked to *Stone* to determine the timing of his motion to dismiss"; (2) "[he] could not have foreseen at the time he filed his motion that HRPP [Rule] 48 would be applied differently by the trial court"; and (3) "had he known that the *Balauro* rule would be applied, he could have filed a successful HRPP [Rule] 48 motion at a later time." *Ikezawa*, 75 Haw. at 222, 857 P.2d at 599. This court decided not to retroactively apply *Balauro* to Ikezawa. *See id.* at 223, 857 P.2d at 599.

**17.** HRS § 291-4(b)(1)(C)(ii) (1993) provided that the maximum prison sentence for commission of a first offense of DUI was five days, reduced from the thirty-day sentence in effect prior to Act 128's amendment. *See Nakata*, 76 Hawai'i at 364, 878 P.2d at 703.

**18.** *Hoey* involved the validity of a state criminal procedural rule. *See Jackson*, 81 Hawai'i at 50, 912 P.2d at 82. This court chose to adopt the constitutionally-based rationale from *Griffith* and

attributable to motions for supervised release, bail reduction, or both were not excludable under HRPP Rule 48(c), which mandated the dismissal of criminal charges in the event trial did not commence within six months. *See id.* at 28, 881 P.2d at 515. Jackson's trial commenced 217 days after the date of his arrest, exceeding by thirty-seven days the 180–day limit under HRPP Rule 48. *See Jackson*, 81 Hawai'i at 50, 912 P.2d at 82. However, adhering to case law in effect at the time of the hearing, *see State v. Durry*, 4 Haw.App. 222, 665 P.2d 165 (1983), *overruled by Hoey, supra*, the trial court excluded from the 217 days twenty-eight days during which Jackson's motion for supervised release or bail reduction was pending and fifteen days attributable to a rescheduled pretrial status conference. *See* 81 Hawai'i at 50, 912 P.2d at 82. In contrast, under the *Hoey* rule, the twenty-eight days attributable to the motion for supervised release or bail reduction would not have been excluded and the charges against Jackson would have had to be dismissed.

While suggesting that retroactive application is not automatic and that the concept of fairness affects retroactivity, *see id.* at 51, 912 P.2d at 83 (citation omitted), this court, citing *Powell*, gave retroactive effect to the rule adopted in *Hoey*:

> Because we applied the *Hoey* rule to vacate Hoey's conviction, rather than limiting its application to future appeals, "persuasive federal authority would suggest that we would be obligated to apply the same rule to all other criminal proceedings currently pending in the court system."

[*Kekona*, 77 Hawai'i at 410 n. 3, 886 P.2d at 748 n. 3] (citing *Powell* [, *supra*]). This is true for two reasons:

> First, the nature of judicial review precludes us from simply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new [rules], and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule. Second, selective application of new rules violates the principle of treating similarly situated defendants the same.

*Id.* (quoting *Powell*, 511 U.S. at [84], 114 S.Ct. at 1283) (citations, quotation marks, ellipsis points, brackets, and emphases omitted).

*Id.* It was reasoned that because (1) Jackson's appeal was pending when the new rule in *Hoey* was announced and, thus, Jackson's "appeal could just as easily have been the case 'fish[ed] from the stream of appellate review' to serve as the vehicle for the pronouncement of this rule," and because (2) the court "chose to apply the new rule to Hoey himself, [this court was] obligated to apply the rule to all similarly situated defendants whose appeals were pending at the time it was announced." *Id.* (citations and parenthetical explanations omitted). *Jackson* did not employ the criteria set forth in *Russell* and *Ikezawa*, but viewed retroactive application as "obligat[ory]" when "this court applied [a new] rule to vacate [a defendant]'s conviction [in the case announcing the new rule], rather than limiting its application to future appeals[.]" [19] *Id.* (internal quotation marks and citation omitted).

---

*Powell* and to apply it in *Jackson*, concluding that "*Powell* requires retroactive application of *Hoey*." *Id.* at 51, 912 P.2d at 83. *Jackson* relied on Justice Levinson's concurring and dissenting opinion in *State v. Kekona*, 77 Hawai'i 403, 886 P.2d 740 (1994), which stated that if tape recordings of confessions were required under the Hawai'i Constitution, the "*reasoning* of *Powell* and *Griffith*" would not preclude a prospective application to "future and as yet uncharged criminal defendants." *Id.* at 411 n. 3, 886 P.2d at 748 n. 3 (emphasis added).

**19.** In *Jackson*, it was said that "*Powell* requires retroactive application of *Hoey*." 81 Hawai'i at 51, 912 P.2d at 83. This statement may be too broad. *Powell* required that the rule adopted in

*McLaughlin* be applied "retroactively to all cases[,] state or federal, pending on direct review or not yet final." *Powell*, 511 U.S. at 80, 114 S.Ct. 1280. *Griffith* and *Powell* would not appear to mandate that the states retroactively apply a new constitutional rule for criminal cases unless the rule was applicable to the states through the fourteenth amendment. *See People v. Sexton*, 458 Mich. 43, 580 N.W.2d 404, 410 (Mich.1998) (stating that *Griffith*'s mandatory retroactivity rule is binding on cases involving "rules of criminal procedure that are grounded on the United States Constitution"). Of course, that mandate would be binding on us were we to announce a new constitutional rule based on our interpretation of the United States Constitution's Bill of Rights. However, we may, as we have in

■ The analytical focus in *Ikezawa* and *Nakata* was whether the retroactive application of a new rule in criminal cases would substantially prejudice a defendant.[20] The principle exemplified in *Santiago* and *Jackson* called for equal treatment of those who were situated in circumstances similar to that of the defendant in whose case a new rule was proclaimed. In other words, when this court announces a new rule that benefits a defendant and applies the rule to the defendant in the case in which the rule is announced, it must be applied to all " 'similarly situated defendants.' " *Jackson*, 81 Hawai'i at 51, 912 P.2d at 83 (quoting *Griffith*, 479 U.S. at 328, 107 S.Ct. 708). We apply these principles.

## XI.

Retroactive application of *Wilson* will not prejudice Defendant. In *Wilson*, a majority of this court applied the holding to Wilson, the defendant in that case, by suppressing his BAC test result. *See* 92 Hawai'i at 53–54, 987 P.2d at 276–78. Complying with *Jackson*, we cannot grant the benefit of the *Wilson* rule to Wilson and choose not to apply it to other similarly situated defendants because such "selective application of new rules violates the principles of treating similarly situated defendants the same." *Jackson*, 81 Hawai'i at 51, 912 P.2d at 83 (internal quotation marks and citations omitted). "[I]t hardly comports with the ideal of administration of justice with an even hand, when one chance beneficiary—the lucky individual whose case was chosen as the occasion for announcing the new principle—enjoys retroactive application, while others similarly situated have their claims adjudicated under the old doctrine." *Griffith*, 479 U.S. at 327, 107 S.Ct. 708 (internal quotation marks and citations omitted). Because the newly announced rule was extended to Wilson, we can perceive of no justification for withholding its application to those defendants who are similarly situated.

## XII.

■ "[A]ll other similarly situated defendants" are those defendants in "all cases . . . pending on direct review or *not yet final* [,]" *id.* at 328, 107 S.Ct. 708 (emphasis added), at the time *Wilson* was decided. A defendant whose "conviction was not final when [*Wilson*] was announced" is "entitl[ed] . . . to rely on [*Wilson*]." *Powell*, 511 U.S. at 84, 114 S.Ct. 1280. "By final we mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before our decision in [*Wilson*]." *Linkletter*, 381 U.S. at 622 n. 5, 85 S.Ct. 1731.

In this case, Defendant was arrested on September 5, 1999. Arraignment, plea, and trial were set for October 8, 1999 and apparently continued to November 29, 1999. On October 28, 1999, this court decided *Wilson*. Defendant was apparently arraigned on November 29, 1999. On January 28, 2000, Defendant moved to suppress the BAC test result. The court entered its order granting the motion on May 19, 2000. Defendant's case was pending at the trial level at the time of the *Wilson* decision. Therefore, we conclude that *Wilson* applies retroactively to him.

## XIII.

Based on the foregoing, we affirm the district court's May 19, 2000 findings of fact, conclusions of law, and order granting Defendant's motion to suppress the intoxilyzer result.

Dissenting Opinion by NAKAYAMA, J., with whom RAMIL, J., joins

I respectfully dissent from the majority's opinion. In my view, *State v. Wilson*, 92

---

*Jackson*, adopt the *Griffith* rationale in determining that retroactive application should be given to new rules for criminal cases that are rooted in our own state constitution, statutes, or court rules.

20. *Russell* involved the retroactive effect to be given a new rule after a case has become final. We are not presented with that issue in this case.

For example, *see* Justice Harlan's dissent in *Mackey* to the effect that "given the current broad scope of constitutional issues cognizable on habeas, it is sounder . . . generally to apply the law prevailing at the time a conviction became final than it is to seek to dispose of all these cases on the basis of intervening changes in constitutional interpretation." 401 U.S. at 688–89, 91 S.Ct. 1160 (Harlan, J., dissenting).

Hawai'i 45, 987 P.2d 268 (1999), was wrongly decided and should be overruled. Therefore, in the present case, I would vacate the circuit court's findings of fact, conclusions of law, and order granting Garcia's motion to suppress the intoxilyzer results.

The arguments that *Wilson* was incorrectly decided are set out at length in my dissent in *Wilson.* 92 Hawai'i at 54, 987 P.2d at 277 (Nakayama, J., with whom Ramil, J., joins, dissenting). In particular, the inconsistency between *Wilson* and our case law regarding the exclusionary rule and this court's supervisory powers warrants emphasis here.

This court has previously recognized that: " 'A defendant who seeks to benefit from the protections of the exclusionary rule has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also that his own constitutional rights were violated by the search and seizure challenged.' " *State v. Pattioay*, 78 Hawai'i 455, 466, 896 P.2d 911, 922 (1995) (quoting *State v. Scanlan*, 65 Haw. 159, 160–61, 649 P.2d 737, 738 (1982)). However, under appropriate circumstances, evidence obtained in violation of statutes or rules, but without constitutional violation, may be suppressed "under the authority of this court's supervisory powers in the administration of criminal justice in the courts of our state." *See id.* at 469, 896 P.2d at 925. We cautioned that "the courts' inherent powers must be exercised with restraint and discretion and only in exceptional circumstances" and that "invocation of a court's inherent power is legitimate only . . . when reasonably necessary to carry out and protect the court's constitutional authority." *Id.* at 469 n. 28, 896 P.2d at 925 n. 28 (citations and internal quotation marks omitted). Thus, as emphasized in the concurring opinion in *Pattioay*, this exception to the exclusionary rule "should only be applied in very limited situations." *Id.* at 470, 896 P.2d at 926 (Ramil, J., concurring). This court should determine "on a case-by-case basis . . . whether the rationales underlying the exclusionary rule are served and whether the law violation warrants its application." *Id.* at 471, 896 P.2d at 927.

In my view, the majority's holding in *Wilson* is inconsistent with the principle that this court's supervisory powers should only be exercised in exceptional circumstances. I cannot agree that such exceptional circumstances existed in *Wilson* because the implied consent statute does not create a right of voluntary choice and does not expressly provide for the remedy of suppression in criminal DUI prosecutions where the defendant was not fully informed of the administrative consequences. *See* 92 Hawai'i at 55–58, 987 P.2d at 278–82 (Nakayama, J., dissenting). The majority in *Wilson* argued that

> [i]t cannot be the intent of the implied consent statute to allow a blood sample to be taken in violation of its terms, to suppress it in the driver's administrative revocation proceeding as being violative of the law, and then to allow its admission in the driver's corresponding criminal DUI prosecution because there was no infirmity in its acquisition.

92 Hawai'i at 52, 987 P.2d at 276. However, there was no allegation that the officer erroneously warned Wilson regarding potential criminal penalties. Where the infirmity in the warning lies in the administrative consequences, the remedy should lie in the administrative proceeding. Therefore, it would not have been inconsistent to admit the test results in the DUI prosecution even if they were not admissible in the administrative proceedings.

Further, even assuming that the remedy of suppression is available in the DUI prosecution, I do not believe that the warning Wilson received was so misleading as to warrant the exceptional action of suppressing the evidence under this court's supervisory powers. The warning given to Wilson did not imply that taking the test was a "safe harbor, free of adverse consequences." *See Wilson*, 92 Hawai'i at 59, 987 P.2d at 282 (Nakayama, J., dissenting) (quoting *South Dakota v. Neville*, 459 U.S. 553, 566, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983)) (emphasis and internal quotation marks omitted). The form read to him stated that he would have his license revoked for one year if he refused to take the test, as opposed to three months if he took the test and failed. *Id.* at 46–47, 987 P.2d at 269–70. However, pursuant to HRS § 286–261 (Supp.

1998), as interpreted by *Gray v. Administrative Director of the Court, State of Hawai'i*, 84 Hawai'i 138, 931 P.2d 580 (1997), his license could have been revoked from three months up to one year. The officer's warning, although not fully educating Wilson of the administrative consequences of taking the test, did convey that taking the test was a more attractive alternative than refusing the test. The error in the warning given to Wilson was not so misleading as to have "tricked" or "coerced" him into consenting. That being the case, this court should not have exercised its supervisory powers to affirm the suppression of Wilson's test results.

Finally, although I agree with the majority that the principle of stare decisis has added force when the legislature has relied upon a judicial decision, *see* Majority opinion at 206, 29 P.3d at 925 (quoting *Hilton v. South Carolina Pub. Ry. Comm'n*, 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991)), I do not believe such deference is appropriate here. In adopting Act 189 in 2000, the legislature stated that it was:

> Codifying existing appellate case law, (See *State v. Wilson*, 92 Hawai'i 45, 987 P.2d 268 (1999) and *Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 931 P.2d 580 (1997)) concerning the *minimum and maximum periods of administrative revocation* possible under section 286–261(b)(1)–(3), HRS[.]

Conf. Comm. Rep. No. 25, in 2000 House Journal at 855 (emphasis added). Act 189 amended HRS § 286–261 in pertinent part:

> (b) The periods of administrative revocation with respect to a driver's license and motor vehicle registration, if applicable, that [may] *shall* be imposed under this part are as follows:
>
> (1) [Three] *A minimum of three* months[,] *up to a maximum of one year revocation of driver's license,* if the arrestee's driving record shows no prior alcohol enforcement con-

tacts during the five years preceding the date of arrest;

> (2) [One] *A minimum of one* year *up to a maximum of two years revocation of driver's license* and all registrations of motor vehicles registered to the arrestee if the arrestee's driving record shows one prior alcohol enforcement contact during the five years preceding the date of arrest;
>
> (3) [Two] *A minimum of two* years *up to a maximum of four years revocation of driver's license* and all registrations of motor vehicles registered to the arrestee if the arrestee's driving record shows two prior alcohol enforcement contacts during the seven years preceding the date of arrest;
>
> . . . .
>
> [ (c)] *(d)* The driver's license of an arrestee who refuses to be tested after being informed of the sanctions of this part shall be revoked under subsection (b)(1), (2), [and] (3), *and (4)* for a period of one year, two years, [and] four years, *and a life time,* respectively.

2000 Haw. Sess. L. Act 189, § 16, at 401–02 (relevant additions underscored and relevant deletions bracketed). The legislature did not amend HRS § 286–261 in reliance upon this court's holding in *Wilson* concerning whether suppression is appropriate in a DUI prosecution where there was an erroneous advisement regarding the administrative penalties.[1] Therefore, the legislature's amendment of HRS § 286–261 would not be called into question if this court overruled *Wilson*.

Based on the foregoing, I would overrule *Wilson* and hold that the circuit court in the present case erroneously granted Garcia's motion to suppress the results of his intoxilyzer test.

---

1. I also note that none of the other amendments to HRS Chapter 286, Part XIV, Administrative Revocation of Driver's License, or to HRS §§ 291–4, Driving under the influence of intoxicating liquor, or 291–4.4, Habitually driving under the influence of intoxicating liquor or drugs, relied upon these portions of *Wilson*. Further, the legislature did not amend HRS § 286–151, the implied consent statute. 2000 Haw. Sess. L. Act 189 (amending various provisions of chapter 286).